2025 IL App (4th) 240568

NO. 4-24-0568

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 12, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| ALISHAH CADENGO, | ) | No. 21CF2285 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Randy Wilt, |
| | ) | Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court, with opinion.
Justices Knecht and Cavanagh concurred in the judgment and opinion.

**OPINION**

¶ 1      A jury found defendant, Alishah Cadengo, guilty of one count of stalking, a Class 4 felony (720 ILCS 5/12-7.3(a)(2) (West 2020)) and one count of identity theft, a Class 3 felony (*id.* § 16-30(a)(7)). As part of defendant's sentence, the trial court imposed $1,799 in assessments. The court also ordered defendant to relinquish her firearm owner's identification (FOID) card and any firearms she possessed to the State.

¶ 2      Defendant appeals, arguing (1) the statutory provision that provided the basis for her identity theft conviction is unconstitutional, (2) the State failed to prove her guilty of identity theft beyond a reasonable doubt, (3) the trial court abused its discretion by overruling defense counsel's objections to the State's exhibits and her conviction for stalking should be reversed, (4) her second amendment rights (see U.S. Const., amend. II) were violated by the prohibition on

her possessing firearms, and (5) her attorney was constitutionally ineffective because she failed to apply for a waiver of fees.

¶ 3        We vacate defendant's conviction for identity theft but affirm her conviction for stalking and her sentence.

¶ 4                                    I. BACKGROUND

¶ 5        In November 2021, a grand jury indicted defendant on four counts. Count I alleged that, between May 2021 and August 2021, defendant committed stalking, a Class 4 felony (720 ILCS 5/12-7.3(a)(2) (West 2020)), by monitoring Sarah Chermack's actions through her bank account information, surveilling her at her residence, and communicating with her through nonconsensual means. Count II alleged defendant committed identity theft, a Class 3 felony (*id.* § 16-30(a)(7)), by using Sarah's personal identification information to access a record of her actions, activities, or transactions. Count III alleged she committed false personation of a peace officer, a Class 4 felony (*id.* § 17-2(b)(3)), by messaging Sarah that she was "Walter" with "RPD." Finally, count IV alleged defendant committed electronic harassment, a Class B misdemeanor (*id.* § 26.5-3(a)(1)), by making obscene comments to Sarah with the intent to offend her. Defendant pled not guilty and hired a private attorney.

¶ 6        At trial, Sarah testified she and Marco Guzman dated for about two years, beginning around 2019. Around February 2021, after their relationship ended and Guzman began dating someone else, Sarah began receiving messages every day. Sarah testified that "she" was contacting her from different phone numbers and from different Instagram accounts and tried to contact Sarah's family members. The messages appeared to come from an account named "Savannah Zarra." Sarah knew someone with this name, and at the time, she believed Zarra was sending the

messages. The messages contained specific information about Sarah's life. Sarah filed a police report and sought an order of protection against Zarra.

¶ 7        The prosecutor asked, "[J]umping ahead to May of 2021, did you—were you receiving any sort of communications at that point in time?" Sarah answered, "Yes." She explained that the harassing messages were similar in character to those she received in February 2021 and that they got "worse." The messages continued until August 2021. They did not come from a single phone number or account. Instead, according to Sarah, there were at least 50 phone numbers and at least 50 Instagram accounts. Sarah did not remember each account. As soon as she blocked one account, another was created. She acknowledged she did not remember each phone number or "each and every date that [she was] contacted between May and August of 2021."

¶ 8        Sarah testified that for the first "like, six months," she thought the messages would stop. But eventually, she started to screenshot the messages and the Instagram accounts and send the screenshots to a detective. The prosecutor then showed Sarah People's exhibit No. 2, and the following exchange took place:

"Q. Do you recognize that exhibit?

A. Yes.

Q. What is it?

A. It's a text message from one of the Instagram accounts.

Q. And is that—when you received that, did you, as you testified earlier, screenshot it and send it to police?

A. Yes.

Q. People's Exhibit Two, as you look at it, do you remember receiving that message?

A. I do.

Q. Is it a fair and accurate depiction of the message as you received it?

A. It is.

Q. Do you remember what date you received that?

A. I do not recall.

Q. Did you—

A. Or I'm sorry. Can I answer? This says *happy birthday*, so I'm assuming it was on my birthday, June 26th. (Emphasis in original.)"

¶ 9    The State moved to admit exhibit No. 2, and defense counsel objected. The trial court first overruled the objection but then spoke with the attorneys. Defense counsel argued that the State had not provided enough "identifying factors." She claimed that the text message did not indicate who received it or include a date. The court commented that Sarah did not testify she received this message in 2021, only on her birthday. The court overruled the objection. Sarah testified she received the message in 2021, and the court published the exhibit over defense counsel's objection.

¶ 10    Sarah then testified regarding the State's exhibit Nos. 3 through 20, all of which were screenshots of text messages or Instagram messages, except for exhibit No. 11, which was a screenshot of a call log. For exhibit Nos. 4 through 9 and 12 through 20, Sarah testified that she received the messages between May and August 2021, the exhibits were a fair and accurate depiction of the messages she received, and she sent the messages to a detective. For each exhibit, defense counsel objected based on lack of foundation. The trial court overruled each objection.

¶ 11    These exhibits depicted text and Instagram messages from a variety of phone numbers and accounts. For example, exhibit No. 2 was a screenshot of a message from "Haras

- 4 -

Mackcher," saying, "Still no man? Still no kids? Ain't getting younger. Happy birthday old lady." Exhibit No. 13 was a text message saying, "Please stop wasting your money at salons you still don't look good." Exhibit No. 18 said, "You tell people you live in Florida but your [*sic*] 30 and still live with your parents [laughing emoji]."

¶ 12　　　　Sarah testified that the messages contained certain personal information about her. For example, exhibit No. 5 was a screenshot of messages saying, "Last four of your debit card are [1111] right" and, "What's next[,] Social." Sarah testified that this information was accurate, and when she received this message, she felt "[t]errified." Exhibit No. 6 stated, "[1234]; Right[.] hahahhahahahhahahahahah[.] Should I get the rest[.] [1234] This is your own fault." Sarah testified that the numbers were the last four digits of her Social Security Number. Exhibit No. 7 was a set of messages from an account named "Brian Webster." They stated, "Debit card[.] [0000] is how it starts right[?] [witnessemail]@gmail.com right." Other messages in exhibit No. 7 say, "Should we do this at your parents," "I could take everything now," and, "Who's visiting from Wisconsin." Sarah confirmed the debit card number was correct and the e-mail was missing a number but otherwise correct. She testified she received these messages over multiple days. When she received the message about Wisconsin, her sister was visiting from Wisconsin.

¶ 13　　　　Sarah also testified that messages referenced specific events soon after they happened. For example, exhibit No. 3 said, "Saw you at the bank on Harrison!!!!!!!!! Looking pretty rough," followed by some emojis. Sarah testified that her bank was a Chase bank in Rockford, Illinois, on Harrison Avenue. She remembered receiving the message soon after leaving the automated teller machine (ATM), although she did not remember the date. Exhibit No. 8 was messages saying, "How was five guys for lunch ugly girl," and, "You really spent 500 on that ugly ass dog?" Sarah responded to these messages, including saying, "Nolan Walker is the detective on

this so feel free to give him a call." Sarah testified that when she received these messages, she was working in Florida, but she was visiting Illinois. She had gone to a Five Guys restaurant for lunch, and the message was sent minutes after she left the restaurant. Exhibit No. 9 was a text message saying, "Good afternoon my name is Walter with RPD I was looking for Sarah Chermick [*sic*]. Please give me a call at your earliest convenience thank you. Chermack I apologize." At the time, Chermack was communicating with Detective Nolan Walker from the Rockford Police Department about this case. Exhibit No. 14 said, "Wow you really spent over 450 on that? I got some stuff I'm ordering now too so thanks for that[.] Stop wasting your money on stuff and use it to fix your face[.] Or pay someone to love you [laughing emoji]." Sarah testified that she had recently spent $450. Exhibit No. 19 was a series of text messages, beginning at 9:39 a.m. and ending at 7:34 p.m., saying, "Sarah[,] Say my name[.] I see you[.] Airport[.] Are you worried? Flight on United [Airlines]. Maybe I was on the plane too?" Sarah testified that these messages made her feel like she was about to be "attacked." She did not remember the date she received the message, but she received it while she was on a United Airlines (United) plane.

¶ 14        A few times during her testimony, Sarah referred to the sender of the messages. When discussing the e-mail address in exhibit No. 7, Sarah testified, "*She's* missing a zero." (Emphasis added). Later, when discussing the message in exhibit No. 10, she testified, "I didn't actually open it. I didn't want *her* to see that I had read it." (Emphasis added). Both times, defense counsel objected to foundation, and the trial court sustained the objection. At one point, outside the presence of the jury, the court cautioned Sarah, "[Y]our opinion as to who did this right now is not admissible," and "Just listen to the question that's asked. They haven't asked you who did it. So listen to the question that's asked and answer that, please."

¶ 15　　　　Exhibit No. 11 was a screenshot of a list of missed calls from a single phone number from between 8:19 a.m. and 8:22 a.m. on a single day between May and August 2021. Sarah testified it was a fair and accurate depiction of the call log, and there were no calls from that number between those times that were not listed on the exhibit. The exhibit was admitted over defense counsel's objection. Sarah did not know anyone with that phone number.

¶ 16　　　　After all these exhibits were admitted and published to the jury, Sarah testified that when she received the messages, she generally felt like she was being followed all the time and she "didn't have any privacy." She had nightmares daily "about [defendant] coming after [her]."

¶ 17　　　　On cross-examination, Sarah agreed that in 2021, she lived in Florida. She received messages in other months besides May through August 2021. She acknowledged, "[M]y dates are foggy." She was asked how she knew the messages admitted were from between May and August 2021, and she answered, "Because the screenshots are from that date," and "I know in my head the months that I was being contacted." Sarah had never met defendant and had never seen her in person. She admitted that defendant never identified herself in any of the messages and, at first, she thought the messages were from her former friend, Zarra. Regarding the flight, Sarah took only one flight on United in 2021, but she did not remember when in 2021 she took that flight. She confirmed she thought the message referring to "Walter" came from the same person she messaged about "Nolan Walker," even though the names were not identical.

¶ 18　　　　Beth Chermack testified she was Sarah's mother and between May and August 2021, Sarah was receiving "[v]ery vile text messages from a stranger that we did not know who it was." At the time, Sarah was working in Florida. Although Beth lived in Rockford, they would talk using Facetime. During these calls, she noticed that Sarah cried a lot. She would call and read the text messages, and they would cry together.

¶ 19     Detective Walker with the Rockford Police Department testified he was assigned Sarah's case. From May to August 2021, he talked to Sarah, and she gave him messages she received. Often, she sent him messages as she was receiving them. The prosecutor asked Detective Walker when he received specific messages. He did not remember, so he refreshed his recollection with a report he had prepared. He testified to the specific dates on which Sarah sent him the messages in exhibit Nos. 2 through 10 and 12 through 20. The dates ranged from June through early August.

¶ 20     Detective Walker testified that he interviewed defendant on August 10, 2021. His interview was recorded, and that recording was admitted into evidence. During the interview, defendant said that she and her boyfriend, Guzman, started dating in October 2019. When they made their relationship public, Sarah started contacting him. She called and texted him from a lot of numbers. According to defendant, Guzman told her that Sarah kept calling him even though he told her to stop and kept blocking her numbers. Defendant told Detective Walker that Sarah messaged her on Instagram on December 22, 2020, and falsely accused defendant of trying to contact her first.

¶ 21     Defendant told Detective Walker that she started messaging Sarah a couple of months before the interview. She said that she contacted Sarah through "TextNow," never Instagram. She claimed that she found out where Sarah lived and would go there only because she was concerned that Sarah would try to see her boyfriend. Defendant had worked at Chase Bank since May. She saw Sarah outside her bank making a deposit at an ATM. Defendant admitted she probably messaged Sarah that day and said, "I saw you at the bank," or something similar.

¶ 22     Defendant insisted that she never threatened Sarah. Detective Walker read defendant a message from exhibit No. 19 about the airport and asked whether she intended to scare

Sarah. Defendant answered that she never wanted to frighten her. She admitted sending a message asking why no one loved Sarah. She also admitted sending the message asking about the $450 purchase. Detective Walker asked if defendant was trying to scare Sarah by telling her that she had access to her account, and defendant answered that she was just trying to be bothersome.

¶ 23 Defendant again admitted that she drove by Sarah house's because she was worried that Sarah would go see her boyfriend. She also admitted texting about the person in Sarah's driveway. Detective Walker showed her a message, and defendant admitted that she was "Haras Mackcher" and put her initials on the printed-out page. She admitted that an Instagram message sent under the name "Savannah Zarra" was from her and that she posted a picture of Sarah on her Instagram, and she initialed pages with the message and picture. She admitted that she found Sarah's phone number through her work at the bank or through searching on Google. The last time she contacted Sarah was the message about the airport. Defendant also admitted that she looked up Sarah's spending history quite a few times since May and that is how she knew Sarah returned to Rockford. After the recording was played for the jury, copies of the documents that defendant initialed were admitted into evidence as State's exhibit Nos. 22, 23, and 24.

¶ 24 On cross-examination, Detective Walker admitted that he knew the dates that Sarah received the texts based only on what she told him or, if there was a time stamp, based on the time stamp. He testified that before he interviewed defendant, he spoke to her at Chase Bank, where she worked. He was asked if he told her this would be a "wash," and he denied using that word. He agreed that the messages he received were from before August 10. He did not have defendant identify every message because he normally worked as a gang detective, was working on other investigations, and did not have time to prepare all the materials before she came for the interview. On redirect examination, he testified that defendant admitted to using "TextNow," which is an

"internet-based telephone number." He explained, "It's just a number that you can get through an application through the internet so you can get random numbers. And then you can use these numbers for a short period before somebody else can use those same numbers." On recross-examination, he agreed that anyone with Internet access can use TextNow. The State rested.

¶ 25 Defendant moved for a directed verdict on counts I through III. The trial court denied the motion as to counts I and II, but it granted the motion as to count III. The court explained, "I see no evidence whatsoever establishing that this lady did anything in the nature of false personation of a police officer." It explained that Detective Walker could have asked defendant about the message claiming to be from "RPD," but he did not, adding, "[T]here's no evidence here whatsoever that it was her." Defendant presented no evidence. The jury found defendant guilty of count I, stalking, and count II, identity theft, but not guilty of count IV, electronic harassment.

¶ 26 Defendant moved for judgment notwithstanding the verdict or a new trial, arguing that the trial court erred by overruling her objections to the State's exhibits, the State did not prove her guilty beyond a reasonable doubt, and the identity theft statute was unconstitutional. The court denied the motion.

¶ 27 Defendant's presentence investigation report (PSI) noted that she was 27 years old. She had an associate degree and was enrolled in an online program at Arizona State University, expecting to graduate with a bachelor's degree in May 2024. She was employed full-time. She had no prior criminal history. She had close relationships with her family. The report noted that defendant had recently stopped seeing her therapist because she was no longer covered by her parents' health insurance and therapy was too expensive. The report listed one notable asset, a

vehicle worth about $15,000. It indicated she had not filed for bankruptcy and did not rely on any public assistance, adding defendant's "income [was] sufficient to pay her bills, which consist of her rent, utilities, phone, internet, and car payment." Defendant indicated that she had about $46,000 in unpaid student loans and $6,000 in auto loans, but she was "financially stable."

¶ 28    The trial court sentenced defendant to 30 months of conditional discharge, a stayed jail sentence of 180 days, 100 hours of public service work, and a total of $1,799 in assessments. The court allowed defendant two years to pay the assessments. It also warned defendant that she could no longer legally possess a firearm. The court told her, "Simply stated, no guns, no ammo ever again. I'm not sure that you had them ever. If you get caught with them, it's a felony in the State of Illinois for which you can go to prison. It is also a federal penalty offense." The court signed a supplemental sentencing order, stating that defendant, having been convicted of a felony, pursuant to section 5-6-3 of the Unified Code of Corrections (Code of Corrections) (730 ILCS 5/5-6-3(a)(9) (West 2020)), "must physically surrender his or her [FOID] Card to the Department of State police and any and all firearms in his or her possession."

¶ 29    This appeal followed. Defense counsel filed a motion for the appointment of the Office of the Appellate Public Defender (OSAD) on appeal. The motion stated that "at the time of filing of this motion, the defendant was and still is a pauper without financial means to pay for the transcript of the proceedings in this cause." OSAD was appointed to represent defendant on appeal.

¶ 30                                    II. ANALYSIS

¶ 31    Defendant asks us to reverse her convictions. She contends that subsection (a)(7) of section 16-30 of the Criminal Code of 2012 (Code) (720 ILCS 5/16-30(a)(7) (West 2020)), which provided the basis for her identity theft conviction, is unconstitutional. She further contends that the State failed to prove her guilty of identity theft beyond a reasonable doubt. In challenging

her conviction for stalking, she argues the trial court erred by admitting the State's exhibits over her objections and she would not have been convicted if the court had excluded those exhibits. If we uphold either of her convictions, she argues that she received ineffective assistance of counsel because her attorney failed to apply for a waiver of court fees and that the permanent prohibition on her owning a firearm violates the second amendment.

¶ 32                                    A. Identity Theft

¶ 33        We begin with defendant's conviction for identity theft. Defendant asks us to find the underlying statutory provision, subsection (a)(7) of section 16-30 of the Code, facially unconstitutional and vacate her conviction. See *id.* We presume that all statutes are constitutional, and "the party challenging the constitutionality of a statute has the burden of establishing its invalidity." *People v. Carpenter*, 228 Ill. 2d 250, 267 (2008). "A statute is facially invalid only if there is no set of circumstances under which the statute would be valid." *People v. Gray*, 2017 IL 120958, ¶ 58. Whether a statute is unconstitutional is a question of law, which we review *de novo*. *People v. Johnson*, 225 Ill. 2d 573, 584 (2007).

¶ 34        Defendant claims her conviction under section 16-30(a)(7) denied her due process of law. "Pursuant to its police power, the legislature has wide discretion to establish penalties for criminal offenses, but this discretion is limited by the constitutional guarantee that a person may not be deprived of liberty without due process of law." *People v. Wright*, 194 Ill. 2d 1, 24 (2000). "When legislation does not affect a fundamental constitutional right, the test for determining whether it complies with substantive due process requirements is the rational basis test." *Carpenter*, 228 Ill. 2d at 267. "Under this test, a statute will be upheld if it 'bears a reasonable relationship to a public interest to be served, and the means adopted are a reasonable method of

accomplishing the desired objective.' " *Wright*, 194 Ill. 2d at 24 (quoting *People v. Adams*, 144 Ill. 2d 381, 390 (1991)).

¶ 35        Section 16-30(a)(7) of the Code states:

"(a) A person commits *identity theft* when he or she knowingly:

* * *

(7) uses any personal *identifying* information or personal identification document of another for the purpose of gaining access to any record of the actions taken, communications made or received, or other activities or transactions of that person, without the prior express permission of that person[.]" (Emphases added.) 720 ILCS 5/16-30(a)(7) (West 2020).

¶ 36        In *People v. Madrigal*, 241 Ill. 2d 463 (2011), the supreme court considered a different, but nearly identical, provision criminalizing identity theft. That provision stated that:

" '(a) A person commits *the offense of identity theft* when he or she knowingly:

* * *

(7) uses any personal *identification* information or personal identification document of another for the purpose of gaining access to any record of the actions taken, communications made or received, or other activities or transactions of that person, without the prior express permission of that person.' " (Emphasis omitted and emphases added.) *Id.* at 469-70 (quoting 720 ILCS 5/16G-15(a) (West 2008)).

The statute also defined "personal identifying information" to "include everything from a person's name, address, date of birth, or telephone number to obviously more confidential identifying

information such as social security numbers, bank account numbers or credit card numbers." *Id.* at 471 (citing 720 ILCS 5/16G-10(b) (West 2008)). The court found that section 16G-15(a)(7) punished "a wide array of wholly innocent conduct," including searching someone's name on a social media site, such as Facebook, to find a record of communications that person received. *Id.* at 471-72. The court concluded that this provision "lack[ed] a culpable mental state, as it does not require a criminal purpose for a person to be convicted of a felony." *Id.* at 472. After declining to read a culpable mental state into the statute, the court struck down section 16G-15(a)(7) as facially unconstitutional. *Id.* at 479.

¶ 37        Defendant contends that the same reasoning applies here. The provision at issue here, section 16-30(a)(7), is identical to section 16G-15(a)(7), the provision in *Madrigal*, except for two minor differences. First, section 16-30(a)(7) refers to "identity theft," but section 16G-15(a)(7) referred to "the offense of identity theft." Second, section 16-30(a)(7) refers to "personal identifying information" and section 16G-15(a)(7) referred to "personal identification information." According to defendant, neither of these differences are relevant to the court's reasoning in *Madrigal*. Defendant further observes that the General Assembly has not defined "personal identification information," but the definition of "personal identifying information" is practically the same as when *Madrigal* was decided. Compare 720 ILCS 5/16G-10 (West 2008), with 720 ILCS 5/16-0.1 (West 2020). Defendant argues that subsection 16-30(a)(7) is not a reasonable method of accomplishing the legislature's objective of preventing identity theft, so we should find it facially unconstitutional.

¶ 38        The State concedes that subsection (a)(7) is unconstitutional. The State recognizes that section 16-30(a)(7) punishes "a wide array of wholly innocent conduct" and the court should not read a criminal-purpose requirement into the statute, especially where the statute already

- 14 -

requires a mental state of "knowingly." See *Madrigal*, 241 Ill. 2d at 471; 720 ILCS 5/16-30 (West 2020). Therefore, the State admits that we should find section 16-30(a)(7) unconstitutional and vacate defendant's conviction for identity theft.

¶ 39 We agree with the parties. We see no basis to distinguish section 16-30(a)(7) from section 16G-15(a)(7). Under section 16-30(a)(7), anyone who, for example, "us[es] the Internet to look up how their neighbor did in the Chicago Marathon," would be "us[ing] any personal identifying information or personal identification document of another for the purpose of gaining access to any record of the actions taken, communications made or received, or other activities or transactions of that person, without the prior express permission of that person," and therefore would be guilty of a felony. 720 ILCS 5/16-30(a)(7) (West 2020); see *Madrigal*, 241 Ill. 2d at 471-72. Like section 16G-15(a)(7), section 16-30(a)(7) "punish[es] as a felony a wide array of wholly innocent conduct." *Madrigal*, 241 Ill. 2d at 471. Section 16-30(a)(7) is not "a rational way of addressing the problem of identity theft," so it is facially unconstitutional. *Id.* at 473. Therefore, we vacate defendant's conviction under count I. See *id.*

¶ 40 Because we vacate defendant's conviction on constitutional grounds, we need not address defendant's claim that the State failed to prove her guilty of identity theft beyond a reasonable doubt.

¶ 41                                                 B. Stalking

¶ 42 Defendant also asks us to vacate her conviction for stalking. She claims that the trial court erred by overruling defense counsel's objections to the State's exhibits showing screenshots of text and Instagram messages Sarah allegedly received. She further claims that without these exhibits, the jury would not have found her guilty.

¶ 43    The State, as proponent of the messages, bore "the burden of proving the necessary elements for admissibility." *People v. Torres*, 2012 IL 111302, ¶ 53. "An adequate foundation is laid when a document is identified and authenticated." *People v. Chromik*, 408 Ill. App. 3d 1028, 1046 (2011). Illinois Rule of Evidence 901(a) (eff. Sept. 17, 2019) states, "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." We have considered the following nonexhaustive list of factors relevant to determining whether a proponent of evidence has made a *prima facie* showing of authenticity:

> "(1) the purported sender admits authorship, (2) the purported sender is seen composing the communication, (3) business records of an Internet service provider or cell phone company show that the communication originated from the purported sender's personal computer or cell phone under circumstances in which it is reasonable to believe that only the purported sender would have had access to the computer or cell phone, (4) the communication contains information that only the purported sender could be expected to know, (5) the purported sender responds to an exchange in such a way as to indicate circumstantially that he was, in fact, the author of the communication, or (6) other circumstances peculiar to the particular case." *People v. Kent*, 2017 IL App (2d) 140917, ¶ 118.

See *People v. Price*, 2021 IL App (4th) 190043, ¶ 118. "If the court, after serving its screening function, allows the evidence to be admitted, the issue of the document's authorship is ultimately for the jury to determine." *People v. Ziemba*, 2018 IL App (2d) 170048, ¶ 51. We review a trial court's decisions on the admissibility of evidence for an abuse of discretion. *People v. Watkins*, 2015 IL App (3d) 120882, ¶ 35. We will uphold the court's decision unless its ruling was arbitrary,

fanciful, or unreasonable, or no reasonable person would have taken its view. *Id.*

¶ 44　　　　Defendant argues that the State failed to provide adequate foundation for the screenshots of Instagram messages and text messages Sarah received. Defendant particularly challenges the basis for concluding that Sarah received the messages between May and August 2021, which was the period the State alleged in the indictment. The screenshots themselves had no dates and no indication that Sarah was the recipient. Instead, the State relied on Sarah's testimony to establish that she received the messages and when she received them. But Sarah could not identify any specific date she received any specific message, except perhaps the message, "happy birthday," which she assumed she received on her birthday. Sarah admitted her memory of the dates was "foggy." She repeatedly claimed to remember specific events, such as going to the bank ATM or taking a flight on United, and associated messages with those events, even though she could not remember the dates of any of these messages or events. Defendant contends that Sarah's inability to remember the dates of any of these messages or events renders her claim that she received all these messages between May and August 2021 implausible.

¶ 45　　　　We find the trial court did not abuse its discretion. That the messages themselves lacked any dates is not dispositive, especially where the State relied on witness testimony to lay the foundation. See *Kent*, 2017 IL App (2d) 140917, ¶ 86 ("Authentication of a document may be made by direct or circumstantial evidence, which is routinely the testimony of a witness who has sufficient personal knowledge to satisfy the trial court that the item is, in fact, what its proponent claims it to be."). Here, the State began its line of questioning by asking about messages Sarah started receiving in May 2021. Sarah testified that she received the messages between May and August 2021, she took screenshot of the messages, the screenshots fairly and accurately depicted the messages she received, and she sent the messages to Detective Walker. Sarah certainly had

sufficient personal knowledge to testify to what messages she received and what she did with those messages. If believed, her testimony established that the screenshots were accurate depictions of messages she received during the period the State alleged.

¶ 46 We are not persuaded that Sarah's testimony was so incredible that the trial court abused its discretion in admitting the exhibits. We are aware of no cases requiring a witness to testify to the exact date she received a message. Here, Sarah testified that she received a deluge of messages and phone calls for months. The court reasonably did not expect her to remember the exact date that she received each message. Moreover, even if she could not remember specific dates, Sarah's testimony tying certain messages to specific events, such as the United flight, makes her testimony more trustworthy. Indeed, when she testified that she received the messages between May and August 2021, the court and the jury could reasonably have believed her. See *People v. Brown*, 2013 IL 114196, ¶ 48 ("[A] reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses.") "A finding of authentication is merely a finding that there is sufficient evidence to justify presentation of the offered evidence to the trier of fact and does not preclude the opponent from contesting the genuineness of the writing after the basic authentication requirements are satisfied." *Chromik*, 408 Ill. App. 3d at 1046. Here, Sarah's testimony provided such evidence. Defendant had the opportunity to present evidence contesting the genuineness of the messages, but she did not.

¶ 47 Perhaps the foundation for the date Sarah received the messages in exhibit Nos. 2, 3, and 10 was weaker, because Sarah did not testify that she received those messages between May and August 2021 just before the State moved for admission. But even if the foundation for those exhibits was insufficient, as explained below (*infra* ¶ 53), any error in admitting these exhibits was harmless.

¶ 48        Defendant also argues that the State failed to make a *prima facie* showing that she authored all the messages. She concedes that she admitted to authoring the messages in exhibit Nos. 2, 3, 7, 14, 15, and 19. But, she insists, the other factors for a *prima facie* showing of authenticity are not met for these messages. See *Kent*, 2017 IL App (2d) 140917, ¶ 118; see also *Price*, 2021 IL App (4th) 190043, ¶ 118. For example, the State did not introduce any records from an Internet service provider showing that the messages came from defendant's personal cell phone. Similarly, defendant argues, there were no "other circumstances peculiar to the particular case" to establish authorship. *Kent*, 2017 IL App (2d) 140917, ¶ 118. Furthermore, because Detective Walker did not question defendant about the remaining messages, defendant claims there was insufficient foundation for those exhibits as well.

¶ 49        We disagree. Defendant's admission to sending the messages in exhibit Nos. 2, 3, 7, 14, 15, and 19 sufficiently proved authorship. We do not find that every factor mentioned in *Kent* must be satisfied before a message is authenticated. See *id.* Instead, defendant's admission to authoring these messages adequately established that she authored the messages.

¶ 50        For the remaining exhibits, the State's circumstantial evidence provided sufficient "other circumstances peculiar to the particular case" to establish authorship. *Id.*; see *People v. Towns*, 157 Ill. 2d 90, 104 (1993) ("[A]uthentication can be established by direct and/or circumstantial evidence."); see also *Ziemba*, 2018 IL App (2d) 170048, ¶ 52 ("Circumstantial evidence of authenticity includes such factors as appearance, contents, substance, and distinctive characteristics, which are to be considered with the surrounding circumstances."). By acknowledging that she was the author of the messages in exhibit Nos. 2, 3, 7, 14, 15, and 19, defendant confessed to engaging in a protracted effort to anonymously antagonize Sarah. She admitted using "TextNow," which Detective Walker testified was a program used to generate

disposable phone numbers. She also admitted that she used a false name for at least one account. The inclusion of digits from Sarah's social security number and debit card number in certain messages indicated that only a limited number of people with access to Sarah's personal financial information could be the author. Defendant acknowledged that she accessed Sarah's bank account information and used information she found there in her messages. Furthermore, the tone and content of the messages strongly suggested an author with personal hostility to Sarah, who intended to cause Sarah emotional distress. When defendant confessed to hiding her identity and inundating Sarah with disturbing messages using Sarah's private information, the jury could reasonably conclude that defendant was the individual who was hiding her identity and inundating Sarah with disturbing messages using Sarah's private information.

¶ 51    We note that, in defendant's brief, she discusses evidence admitted throughout the trial, regardless of when it was admitted. She does not contend that the trial court erred by admitting State's exhibit Nos. 2 through 10 and 12 through 20 before the evidence of her confession was introduced, nor does she argue that our analysis is limited to the evidence the State had provided before it moved to admit these exhibits. Instead, she argues that even the video of her confession did not provide an adequate foundation for the exhibits. As explained above, we disagree with defendant's claim.

¶ 52    Regardless, even if the video of defendant's confession could not provide the foundation for exhibit Nos. 2 through 10 and 12 through 20 at the time they were admitted, we would still find no reversible error. First, when the State moved to admit these exhibits, it offered them as evidence of messages that Sarah received. While questioning Sarah on direct examination, the State avoided referring to defendant as the author of the exhibits. When defense counsel first objected to the admission of the exhibits, she argued that the State failed to establish that Sarah

received the messages between May and August 2021. She did not initially argue lack of foundation for authorship. Later, when Sarah referred to defendant as the author, the trial court sustained defense counsel's objections, cautioning Sarah that her opinion on who authored the messages was not admissible and the State had not asked her who the author was. Instead, the State moved to admit exhibit Nos. 2 through 10 and 12 through 20 as evidence of messages that Sarah received between May and August of 2021. Her testimony provided adequate foundation for this claim. See Ill. R. Evid. 901(a) (eff. Sept. 17, 2019) ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding *that the matter in question is what its proponent claims*." (Emphasis added.)); *cf. Watkins*, 2015 IL App (3d) 120882, ¶ 38 (stating where the State sought to use text messages on a cellphone located in the same drawer as drugs to establish the defendant's possession of the drugs but the State failed to establish that the defendant had used the phone and received the messages, the foundation was inadequate).

¶ 53        Second, even if all the screenshots were improperly admitted, the error was harmless. "The improper admission of evidence is harmless when there is no reasonable probability the outcome of the trial would have been different had the evidence been excluded." *People v. Guerrero*, 2021 IL App (2d) 190364, ¶ 88. Here, even without the screenshots of the messages, Sarah's testimony established the extreme number of messages and phone calls she received between May and August 2021 and how these messages frightened her. Exhibit No. 11 showed a series of calls from an unknown number over just a few minutes. Beth's testimony confirmed Sarah's claims about the nature of the messages Sarah received and their effect on her. By initialing exhibit Nos. 22 and 23, defendant admitted that she was responsible for at least some of those messages. Most importantly, defendant admitted that she worked at Sarah's bank, used

this position to look up Sarah's financial information, and messaged Sarah about a $450 purchase and her flight on United. She admitted that she drove by Sarah's residence and messaged her about a car there. She admitted that she contacted Sarah using a variety of numbers or accounts and used pseudonyms, such as "Haras Mackcher." The State alleged that defendant stalked Sarah by monitoring her bank account, surveilling her residence, and communicating with her through nonconsensual means. Defendant confessed to all of this. She introduced no evidence at trial to cast doubt on her own confession or the State's other evidence. Even without the screenshots of the text messages themselves, the State overwhelmingly proved defendant's guilt.

¶ 54                                C. Second Amendment

¶ 55         Because we uphold defendant's conviction for stalking, we must also address her challenges to her sentence. After sentencing defendant to conditional discharge, the trial court entered a supplemental sentencing order, requiring defendant to relinquish her FOID card and any firearms she possessed, pursuant to subsection (a)(9) of section 5-6-3 of the Code of Corrections. 730 ILCS 5/5-6-3(a)(9) (West 2020). The court also warned defendant that because she was now a felon, she could no longer legally possess a firearm. Defendant argues that the requirement that she surrender her FOID card and firearms in section 5-6-3(a)(9), as well as the Illinois statute prohibiting possession of a weapon by felon (720 ILCS 5/24-1.1 (West 2020)), violate her second amendment rights.

¶ 56         The State first responds that we should not consider the constitutionality of section 24-1.1 of the Code. The State cites *People v. Chairez*, 2018 IL 121417, ¶ 13. There, the defendant pled guilty to one count of illegal possession of a firearm within 1,000 feet of a public park, in violation of section 24-1(a)(4), (c)(1.5) of the Code. *Id.* ¶ 1. Later, he petitioned for postconviction relief, arguing that the unlawful use of a weapon statute was unconstitutional. *Id.* ¶ 6. The trial

court agreed, and it struck down section 24-1(a)(4), (c)(1.5) in its entirety, including provisions related to places other than public parks, such as schools or public transportation facilities. *Id.* ¶ 7. The supreme court found this was an error, explaining,

> "Because defendant was convicted of violating section 24-1(a)(4), (c)(1.5) by being within 1000 feet of a public park, the various other 'specific places' offenses set forth in section 24-1(c)(1.5) were not before the circuit court, and therefore defendant lacked standing to challenge the constitutionality of the offenses of which he was not charged." *Id.* ¶ 13.

The court added that the portion of the trial court's order concerning other offenses not before it constituted an advisory opinion, which Illinois courts are not allowed to issue. *Id.* The State argues defendant here similarly lacks standing. According to the State, defendant has not been charged with violating section 24-1.1, so she lacks standing to challenge it.

¶ 57    Defendant asks us to find that she has standing because section 24-1.1 creates a "status-based offense" and she now has the status referenced in section 24-1.1. She also asserts, citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963), and *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971), that any prior restraint on her rights "bears a heavy presumption against its constitutional validity." She argues that she is now a felon and section 24-1.1 prohibits her from exercising her right to possess a firearm, so we should find she has standing to challenge it.

¶ 58    We agree with the State. This case simply does not involve section 24-1.1. We recognize that *Chairez* concerned a somewhat different context, where the trial court's order was overly broad, striking down portions of a statute beyond the provision that the defendant allegedly violated. Nevertheless, the court's reasoning in *Chairez* applies here as well. Defendant has not

been charged with violating section 24-1.1, and that section is not before us, "therefore defendant lacked standing to challenge the constitutionality of the offenses of which [s]he was not charged." *Chairez*, 2018 IL 121417, ¶ 13. Any ruling we issue would be an advisory opinion, which we are not allowed to render. *Id. Sullivan* and *New York Times Co.* are irrelevant. Those cases involve the first amendment (U.S. Const., amend. I), where the category of "prior restraint" has special significance. See *Bantam Books*, 372 U.S. at 64; see also *New York Times*, 403 U.S. at 715 (Black, J., concurring, joined by Justice Douglas); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 733 (1931). These cases certainly do not establish general standing to assert any constitutional argument in any case. Based on *Chairez*, we find defendant lacks standing to challenge section 24-1.1, so we do not address her argument on that statute's constitutionality.

¶ 59 However, we still must address defendant's claim that the trial court's supplemental sentencing order violated the second amendment. Citing section 5-6-3 of the Code of Corrections, the court ordered defendant to surrender her FOID card and all firearms in her possession to the Illinois State Police. See 730 ILCS 5/5-6-3(a)(9) (West 2020). Section 5-6-3(a)(9) requires any defendant who was convicted of a felony or certain specified misdemeanors to "physically surrender at a time and place designated by the court, his or her [FOID] Card and any and all firearms in his or her possession. The Court shall return to the Department of State Police [FOID] Card Office the person's [FOID] Card." *Id.*

¶ 60 Before analyzing the constitutionality of the trial court's order, we first clarify the order's effect. The State contends that the order disarmed defendant only temporarily. According to the State, the court's order and section 5-6-3(a)(9) apply only for the duration of her conditional discharge. The State further contends that defendant voluntarily waived her second amendment right during her conditional discharge, just as a probationer often waives her fourth amendment

(U.S. Const., amend. IV) right against unreasonable searches as a condition of probation. See *People v. Garcia*, 2021 IL App (1st) 190026, ¶¶ 34-42. The State asks us to analyze the trial court's order as though it disarms defendant only for the duration of her sentence, pursuant to defendant's voluntary waiver.

¶ 61    We are not persuaded. Considering the text of section 5-6-3(a)(9) of the Code of Corrections, we find that this provision is the means by which the state permanently disarms newly convicted felons. Section 5-6-3(a)(9) applies to defendants who were

> "convicted of a felony or of any misdemeanor violation of Section 12-1, 12-2, 12-3, 12-3.2, 12-3.4, or 12-3.5 of the Criminal Code of 1961 or the Criminal Code of 2012 that was determined, pursuant to Section 112A-11.1 of the Code of Criminal Procedure of 1963, to trigger the prohibitions of 18 U.S.C. 922(g)(9)." 730 ILCS 5/5-6-3(a)(9) (West 2020).

These defendants are precisely those individuals who are permanently barred from possessing firearms because of criminal convictions. See 720 ILCS 5/24-1.1 (West 2020); see also 725 ILCS 5/112A-11.1 (West 2020); see also 18 U.S.C. § 922(g)(9) (2018). Section 5-6-3(a)(9) contains no procedures by which defendant could reclaim her surrendered FOID card or firearms after she completes her conditional discharge. This is not surprising, because, pursuant to section 24-1.1, she cannot lawfully possess a firearm. See 720 ILCS 5/24-1.1 (West 2020). Instead, section 5-6-3(a)(9) permanently deprives her of her FOID card and firearms.

¶ 62    This interpretation is supported by subsection (a)(3) of section 5-6-3, which states that persons subject to conditional discharge shall "refrain from possessing a firearm or other dangerous weapon where the offense is a felony or, if a misdemeanor, the offense involved the intentional or knowing infliction of bodily harm or threat of bodily harm." 730 ILCS 5/5-6-3(a)(3)

(West 2020). In contrast with subsection (a)(9), subsection (a)(3) is more plausibly characterized as a temporary prohibition for the duration of conditional discharge. It requires a defendant while subject to conditional discharge to "refrain from possessing a firearm." It does not require a defendant to relinquish her FOID card and firearms to the government, with no mechanism or procedure for reclaiming them. We presume that subsection (a)(3) and subsection (a)(9) are not redundant. See *People v. Lloyd*, 2013 IL 113510, ¶ 25 ("[S]tatutes should be read as a whole and construed so that no part is rendered meaningless or superfluous."). We therefore understand subsection (a)(3) as a condition that defendant not possess firearms during her conditional discharge and subsection (a)(9) as a permanent disarming of qualifying defendants.

¶ 63        Because we find subsection (a)(9) permanently disarmed defendant, we reject the State's analogy to a temporary waiver of fourth amendment rights. Although probationers generally consent to searches that might otherwise implicate fourth amendment protections during the period of probation, they do not waive all fourth amendment rights for the rest of their lives. Here, defendant did not voluntarily and irrevocably waive her second amendment rights for the rest of her life as part of her conditional discharge.

¶ 64        Having concluded that the trial court's order, pursuant to subsection (a)(9), ordered defendant to permanently surrender her FOID card and firearms, we now consider whether this order violated defendant's rights under the second amendment. The second amendment states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. This amendment guarantees an individual right to keep and bear arms. *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). It applies to the states through the due process clause of the fourteenth amendment. U.S. Const., amend. XIV; *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010). The United States Supreme

- 26 -

Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2002), established the test used to evaluate firearms regulations. Under *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*. at 17. "Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " *Id.* (quoting *Konigsberg v. State Bar of California*, 366 U.S. 36, 50 n.10 (1961)). The constitutionality of a statute is a question of law, which we review *de novo*. *People v. Burns*, 2024 IL App (4th) 230428, ¶ 10.

¶ 65   Defendant raises both a facial and as-applied challenge. For her facial challenge, she argues that categorial prohibitions on felons possessing firearms violate the second amendment. She acknowledges that we rejected this claim in *Burns*, where we concluded that "[t]he second and fourteenth amendments protect the right of 'law-abiding citizens' to possess handguns" and felons, "by definition," are not law-abiding citizens. *Id.* ¶ 21. She asks us to reconsider this decision. We decline to do so. We have consistently followed *Burns*. See, *e.g.*, *People v. Gardner*, 2024 IL App (4th) 230443, ¶ 68; *People v. Pruitte*, 2024 IL App (4th) 240013-U, ¶ 36; *People v. Bruce*, 2025 IL App (4th) 240706-U, ¶ 23. Defendant raises no new arguments, so we reject her facial claim for the same reasons given in *Burns* and the other cited cases.

¶ 66   Defendant also raises an as-applied challenge. Unlike a facial challenge to a statute, "an 'as-applied' challenge protests against how a statute was applied in the particular context in which the challenging party acted or proposed to act. Accordingly, in an as-applied challenge, the challenging party's particular facts and circumstances become relevant." *Gray*, 2017 IL 120958, ¶ 58. "An as-applied challenge requires a showing that the statute violates the constitution as it applies to the facts and circumstances of the challenging party." *People v. Thompson*, 2015 IL

118151, ¶ 36.

¶ 67 Defendant argues that subsection (a)(9) is unconstitutional as applied to her. Before this case, she had no prior criminal convictions. More importantly, defendant insists her conviction here for stalking was a nonviolent offense. The State neither proved nor even alleged that she ever threatened Sarah. Defendant argues that "there is no historical precedent for a permanent ban on possessing firearms for non-violent individuals."

¶ 68 We disagree. Even if we accept defendant's characterization of her offense, we decline to distinguish between violent and nonviolent felonies in this context. In upholding bans on possession of firearms by felons, none of the cases cited above distinguish between violent and nonviolent felonies. See *Burns*, 2024 IL App (4th) 230428, ¶¶ 19-20; see also *Gardner*, 2024 IL App (4th) 230443, ¶ 68; *Pruitte*, 2024 IL App (4th) 240013-U, ¶ 34; *Bruce*, 2025 IL App (4th) 240706-U, ¶ 22. Instead, they find the second amendment applies only to "law-abiding citizens." *Burns*, 2024 IL App (4th) 230428, ¶ 21 (citing *Bruen*, 597 U.S. at 9-10). This indicates that individuals fall outside the protections of the second amendment not only because of felonious violence, but also because of their refusal to behave lawfully. Even nonviolent felons are excluded from the second amendment's protections.

¶ 69 Defendant contrasts this case with *United States v. Rahimi*, 602 U.S. 680 (2024). There, the Supreme Court upheld a ban on the possession of firearms by an individual subject to a domestic violence restraining order, after a finding that he " 'represents a credible threat to the physical safety of [an] intimate partner.' " *Id.* at 685 (citing 18 U.S.C. § 922(g)(8) (2018)). After surveying American's history of gun laws, especially "surety" and "going armed" laws, the Court concluded that, "When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed," adding that the "prohibition on the possession of

firearms by those found by a court to present a threat to others fits neatly within the tradition the surety and going armed laws represent." *Id.* at 693-98.

¶ 70     Defendant argues that, unlike the respondent in *Rahimi*, no court has found that she posed a threat to anyone's safety or threatened violence. Although the trial court ordered her to have no contact with Sarah, defendant insists that this no-contact order is not comparable to the domestic violence restraining order in *Rahimi* because defendant's no-contact order was not based on violence.

¶ 71     *Rahimi* does not change our analysis. Unlike the restraining order in *Rahimi*, the trial court's order here did not depend on a finding that defendant posed a credible threat of physical violence. Instead, defendant must surrender her FOID card and firearms because she is a felon and not a "law-abiding citizen." See *Burns*, 2024 IL App (4th) 230428, ¶ 21. *Rahimi* did not directly consider whether bans on felons possessing firearms were constitutional. Almost in passing, *Rahimi* favorably cited *Heller*'s statement that bans on "the possession of firearms by 'felons and the mentally ill[ ]' are 'presumptively lawful.' " *Rahimi*, 602 U.S. at 699 (quoting *Heller*, 554 U.S. at 626, 627 n.26). This statement, admittedly *dicta*, makes no distinction between violent or nonviolent felonies. Furthermore, although the Court clearly indicated that it upheld the restraining order because of the finding that the respondent presented a danger, we do not interpret *Rahimi* as requiring such a finding before any defendant can be disarmed after a criminal conviction. The Court specifically noted,

> "While we do not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse, [citation], we note that Section 922(g)(8) applies only once a court has found that the defendant 'represents a

- 29 -

credible threat to the physical safety' of another." See *id.* at 698-99.

*Rahimi* simply did not rule on statutes permanently disarming felons, so we continue following *Burns* and other Illinois cases finding that "the *Bruen* decision does not apply to felons." *People v. Boyce*, 2023 IL App (4th) 221113-U, ¶ 16; see *Burns*, 2024 IL App (4th) 230428, ¶ 20.

¶ 72 Because of defendant's felony conviction, she is not a "law-abiding citizen," so the second amendment's guarantees to do not apply to her. The trial court's order disarming her pursuant to section 5-6-3(a)(9) therefore did not violate the second amendment. See 730 ILCS 5/5-6-3(a)(9) (West 2022).

¶ 73                                 D. Fee Waiver

¶ 74 Finally, defendant argues her attorney was constitutionally ineffective because she failed to apply for a waiver of criminal court fees. Criminal defendants have a constitutional right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525-26 (1984). "[T]o prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that his attorney's representation fell below an objective standard of reasonableness and (2) that a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different." *People v. Torres*, 2024 IL 129289, ¶ 27. We review defendant's claim of ineffective assistance of counsel *de novo*. *People v. Lofton*, 2015 IL App (2d) 130135, ¶ 24.

¶ 75 Here, the trial court ordered defendant to pay a total of $1,799 in fines. Defendant claims her attorney should have filed an application for waiver of criminal court assessments. Section 124A-20 of the Code of Criminal Procedure of 1963 provides that,

> "[u]pon the application of any defendant, after the commencement of an action, but
> no later than 30 days after sentencing:

(1) If the court finds that the applicant is an indigent person, the court shall grant the applicant a full assessment waiver exempting him or her from the payment of any assessments." 725 ILCS 5/124A-20 (West 2020).

Section 124A-20 defines "Indigent Person" as

"any person who meets one or more of the following criteria:

(1) He or she is receiving assistance under one or more of the following means-based governmental public benefits programs: Supplemental Security Income [(SSI)]; Aid to the Aged, Blind and Disabled; Temporary Assistance for Needy Families [(TANF)]; Supplemental Nutrition Assistance Program [(SNAP)]; General Assistance; Transitional Assistance; or State Children and Family Assistance.

(2) His or her available personal income is 200% or less of the current poverty level, unless the applicant's assets that are not exempt under Part 9 or 10 of Article XII of the Code of Civil Procedure [(735 ILCS 5/art. XII (West 2020))] are of a nature and value that the court determines that the applicant is able to pay the assessments.

(3) He or she is, in the discretion of the court, unable to proceed in an action with payment of assessments and whose payment of those assessments would result in substantial hardship to the person or his or her family." *Id.*

¶ 76　　　　Defendant contends that she qualifies as an "indigent person." According to the PSI, her income was only "sufficient to pay her bills." She had $46,000 in student loan debt and a $6,000 auto loan. Her only notable asset was her car, with an estimated value of $15,000. Her PSI further noted that she was no longer covered by her parents' health insurance and could not afford

mental health treatment. When moving for the appointment of a public defender on appeal and for a free copy of the trial court transcripts, defense counsel claimed that defendant "was and still is a pauper without financial means to pay for the transcript of the proceedings in this cause." According to defendant, this demonstrates she was a pauper at the time of sentencing.

¶ 77        We disagree. Initially, we find that OSAD's appointment as defendant's attorney on appeal does not prove defendant qualified for a fee waiver. Section 124A-20 provides a specific definition of "Indigent Person," and qualification for a public defender on appeal does not suffice. See *People v. Baker*, 2022 IL App (4th) 210713, ¶ 83 (finding that "the mere fact that OSAD was appointed to represent" the defendant did not demonstrate "substantial hardship.").

¶ 78        Defendant does not indicate precisely what subsection of section 124A-20 she relies on, but the record does not support a finding that she qualifies under any of the three meanings of "indigent person." See 725 ILCS 5/124A-20(a) (West 2020). Nothing in the record indicates that she receives Social Security Income, Supplemental Nutrition Assistance Program, Temporary Assistance for Needy Families, or some other qualifying public benefit under subsection (1). See *id.* § 124A-20(a)(1). Indeed, the PSI stated she did not rely on public assistance. Likewise, the record does not specify her income, so we cannot conclude, under subsection (2), that her income was less than 200% of the poverty level. See *id.* § 124A-20(a)(2).

¶ 79        Defendant also has not established that the trial court would have exercised its discretion to find her unable to proceed with payment under subsection (3). We do not know defendant's monthly income or regular expenses. We have little evidence regarding her potential sources of support or financial responsibilities. We lack any testimony indicating that paying these court fines "would result in substantial hardship to [defendant] or [ ] her family." Defendant's PSI indicated she had full-time employment and was "financially stable." She did not rely on the public

defender at trial but instead retained private counsel to represent her. Although these facts by no means definitively rule out defendant being indigent, without any clear account of defendant's finances or explicit testimony regarding hardship, we will not presume the trial court would have found defendant eligible under subsection (3). We emphasize that defendant bears the burden of showing prejudice. See *Strickland*, 466 U.S. at 693 ("[A]ctual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice."); see also *People v. Lewis*, 2022 IL 126705, ¶ 46. Based on this record, defendant has not met that burden.

¶ 80                                    III. CONCLUSION

¶ 81        For the reasons stated, we vacate defendant's conviction for identity theft but otherwise affirm.

¶ 82        Affirmed in part and vacated in part.

*People v. Cadengo*, 2025 IL App (4th) 240568

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Winnebago County, No. 21-CF-2285; the Hon. Randy Wilt, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Catherine K. Hart, and Daniel N. Arkes, of State Appellate Defender's Office, of Springfield, for appellant. |
| **Attorneys for Appellee:** | J. Hanley, State's Attorney, of Rockford (Patrick Delfino, David J. Robinson, and Allison Paige Brooks, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |