2026 IL App (4th) 250795

NO. 4-25-0795

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 5, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Tazewell County |
| JIMMIE L. WALLACE, | ) | No. 23CF357 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Christopher R. Doscotch, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Justices DeArmond and Grischow concurred in the judgment and opinion.

**OPINION**

¶ 1        Following a stipulated bench trial, defendant, Jimmie L. Wallace, was convicted of

unlawful possession of a weapon by a felon (UPWF) (720 ILCS 5/24-1.1(a) (West 2022)) and

sentenced to three years and two months in prison. He appeals, arguing that (1) the trial court

improperly denied his motion to suppress evidence against him and (2) the UPWF statute is

unconstitutional, both facially and as applied to him. We affirm.

¶ 2                              I. BACKGROUND

¶ 3        On May 22, 2023, at approximately 2 a.m., officers with the Pekin Police

Department conducted a traffic stop of a vehicle in which defendant was a passenger. The stop

resulted in a search of the vehicle, as well as a backpack that defendant had attempted to remove

from the vehicle but was told to leave inside. An officer discovered a firearm in the backpack, and

defendant acknowledged that he had purchased the firearm and knew it was in the backpack. In June 2023, defendant was charged by indictment with UPWF (*id.*). The charge was based on allegations that he possessed a gun after having previously been convicted of the felony offense of unlawful delivery of a controlled substance in Peoria County case No. 11-CF-42.

¶ 4 In March 2024, defendant filed a motion to suppress the evidence against him. He argued that the traffic stop, his detention, and his arrest were unlawful and that the police violated his constitutional rights by ordering him to exit the vehicle without his backpack. Defendant asked the trial court to suppress evidence obtained from the searches of the vehicle and his backpack, along with statements he made to the police.

¶ 5 In January 2025, the trial court conducted a hearing on defendant's motion to suppress. Pekin police officer Tyler Bucco testified that at around 2 a.m. on May 22, 2023, he was on patrol in Pekin and observed a male, later identified as defendant, standing on a corner near a Circle K gas station. Defendant stared as Bucco drove by, and Bucco parked in a nearby parking lot to "wait for a call to come through from dispatch." Bucco denied seeing defendant earlier the same morning. He also described the Circle K as being in "a high crime area." He asserted that drug deals occurred at that location and he had made approximately five methamphetamine-related arrests at Circle K in the two and a half years he worked for the Pekin Police Department.

¶ 6 While parked, Bucco observed a female, who was driving a Nissan SUV, pull into a parking spot at the Circle K. The SUV remained "for less than two seconds" before immediately pulling out and leaving. Bucco did not see anyone enter or exit the vehicle. He testified he found the circumstances suspicious and decided to follow the vehicle. Bucco conducted a "registration check" and learned the vehicle was registered to a single female owner named Julie Pokorny, whose driver's license had been suspended. Bucco initiated a traffic stop of the vehicle, pulling it

over at "an industrial park type of area" that was also "a drug area." Bucco approached the vehicle and identified Pokorny as its driver. He stated defendant was in the vehicle's front passenger seat.

¶ 7 During the traffic stop, Bucco asked Pokorny for proof of insurance, which she was initially unable to provide. Around that time, another Pekin police officer, Cody Vicary, arrived at the scene. Bucco testified that Vicary was the officer who identified defendant. Vicary also spoke with defendant regarding the issue of Pokorny's insurance. Defendant informed Vicary that he "was on the phone with State Farm" and, ultimately, Vicary "was able to collect [Pokorny's] insurance information."

¶ 8 Bucco testified he decided to write Pokorny a ticket for driving with a suspended license and "release her on a notice to appear." At the time of the incident, he had discretion regarding whether to make an arrest for the offense at issue. However, the Pekin Police Department's towing policy required that he have Pokorny's vehicle towed. Bucco testified he was not permitted to allow someone else to drive her vehicle from the scene, even if that person had a valid license.

¶ 9 Bucco stated that Pokorny called for a ride from the scene and Vicary had defendant step out of the vehicle so that the officers could "conduct an inventory of the vehicle." He testified that an inventory involved going through the vehicle and determining what was inside and that its purpose was "to protect the officer and the police department from any accusations of theft or any type of liability that could be associated with towing the vehicle." Conducting an inventory also guarded against allegations of theft by the tow truck driver.

¶ 10 According to Bucco, Vicary began "the tow inventory" while Bucco worked on Pokorny's notice to appear in his squad car. At that time, both defendant and Pokorny were outside of Bucco's car, and defendant was standing at Bucco's window, asking him questions about why

the vehicle had to be towed and why defendant could not drive it. Bucco acknowledged that defendant was free to walk about the scene of the traffic stop for some amount of time before he was ultimately detained. During that time, Bucco never "patted [defendant] down," "frisked" defendant, or asked defendant to keep his hands out of his pockets. He identified the officer safety concerns he had during the stop as being based on "the time of night and where we were and the lack of lighting and essentially the secluded area."

¶ 11 Finally, Bucco testified that he did not take part in the inventory search and did not remember looking at any of the contents of Pokorny's car. He acknowledged that Pekin Police Department policy required "an itemized inventory log" of all the items in a vehicle. Bucco stated that he did not fill out an itemized list. He also had not seen an itemized list prepared by Vicary.

¶ 12 Vicary testified that he assisted Bucco with the underlying traffic stop. Upon his arrival at the scene, he approached the passenger side of the vehicle and identified defendant as the passenger. Vicary agreed that defendant was cooperative and that, at that moment, he had "[n]o concerns about [defendant] for officer safety." Because the driver of the vehicle had a suspended license, the vehicle had to be towed, pursuant to the Pekin Police Department's towing policy.

¶ 13 Once the officers determined the vehicle had to be towed, Vicary asked defendant to step out of the vehicle so that he could conduct an inventory search. He agreed that "a tow inventory" involved going through a vehicle and determining what property was inside before it was towed. The purpose of an inventory search was to protect the property, shield the police from liability, and shelter the tow company from liability "of anything going missing." Vicary testified that as defendant was exiting the vehicle, he tried to remove from the vehicle "a bag" that had been held between his legs. However, Vicary told defendant to leave the "bag," and defendant complied. Vicary testified he did not allow the "bag" to be removed "for [his] safety," stating he did not

- 4 -

"know what could be in the bag." He also testified that he was concerned for his safety, noting defendant's "demeanor of *** being upset about the stop." On examination by the State, Vicary further agreed that the stop occurred at 2 a.m., it was dark outside, there were only two officers at the scene, and the stop was not in a residential area with civilians who could call for help if needed.

¶ 14 Less than two minutes after defendant exited the vehicle, Vicary began the inventory search. "[A]lmost immediately," he located "a small jar with white residue." Vicary described the residue as a "crystal substance." From his training and experience, he was familiar with what methamphetamine looked like, and he recognized the white residue as "an illegal substance." Vicary stated that after locating the jar, he had probable cause to search the car, its occupants, and any containers in the car. He then searched the "bag" that had been between defendant's feet and found a loaded "Glock 22."

¶ 15 Vicary agreed that during the entirety of the traffic stop before the gun was found, defendant was never in handcuffs and no officer had conducted a "pat-down search" of defendant. Vicary stated that "he attempted to ask" defendant to submit to a search or "pat down" to check for weapons after defendant exited the vehicle. He also asked defendant "if he had any weapons on him." According to Vicary, defendant ignored him and walked away. At that point in the stop, Vicary did not know if defendant had any weapons on him, and he characterized defendant as being uncooperative.

¶ 16 Vicary stated that multiple items were found during his search of Pokorny's vehicle, and he agreed that based on the vehicle's contents, "[i]t looked like somebody was moving houses." He also acknowledged that when a vehicle was being towed for impound, the Pekin Police Department required "an itemized inventory log of all the items in the car." Vicary testified that he did not complete a tow receipt that would have included a list of such items. Instead, he "stayed

with the gun" after it was found, and Bucco "ended up completing the tow receipt." Vicary agreed that Bucco did not list the items in the car, explaining that he and Bucco "failed to communicate what was in the vehicle prior to [Bucco] completing the tow receipt."

¶ 17 Defendant testified that he was upset during the traffic stop because Bucco had "followed [him] around" prior to the stop. He stated he saw Bucco several times as he walked from his house to the Circle K, which was several blocks away. During the traffic stop, Vicary ordered him out of the car. Defendant tried to take the backpack he had between his legs but was told to "leave it." Defendant stated he complied because he did not want to make the officer mad. He also testified that before being ordered to exit the vehicle, he got out of the vehicle "a couple times." He stated he exited once to take his cell phone to Bucco's car to help verify that Pokorny's vehicle was insured. He asserted he was also out of the vehicle another time, talking to the officers about why he was not being allowed to drive Pokorny's car.

¶ 18 Following defendant's testimony, the State recalled Bucco as a witness. He denied that prior to Vicary's arrival at the scene, defendant exited Pokorny's vehicle and approached him with his cell phone.

¶ 19 In addition to witness testimony, several exhibits were admitted into evidence at the suppression hearing. The exhibits included (1) recordings from both Bucco's and Vicary's body cameras; (2) transcripts of the officers' body camera recordings; (3) a police report from Emilie Montoya, who also responded to the scene of the traffic stop; (4) written policies of the Pekin Police Department, including its vehicle towing and inventory search policies; (5) a City of Pekin ordinance regarding vehicle seizure and impoundment; and (6) a still image taken from the recording of Vicary's body camera that depicted the items found in defendant's backpack, including the gun.

¶ 20    Consistent with the officers' testimonies, the recordings from their body cameras showed Bucco stopped Pokorny's vehicle and spoke with Pokorny during the stop. After obtaining Pokorny's driver's license, he returned to his squad car and confirmed that her license was suspended. When Vicary arrived at the scene, he spoke with Bucco before approaching Pokorny's vehicle and obtaining defendant's driver's license. Vicary returned to Bucco's squad car, noting that defendant appeared upset for "no reason." He also noted the presence of a glass jar in the vehicle and the backpack between defendant's legs. The officers discussed conducting an inventory search and removing Pokorny and defendant from the vehicle.

¶ 21    Initially, Bucco removed Pokorny from the vehicle, directing her to stand near the front of his car. They discussed Pokorny's suspension and the necessity of having her vehicle impounded. Bucco then returned to his squad car as Pokorny stood with Vicary. Defendant, who was still in Pokorny's vehicle, waved Vicary over, stating he was on the phone with State Farm. Vicary took defendant's phone to Pokorny, who was able to obtain proof that her vehicle was insured. Vicary then returned to Pokorny's vehicle and asked defendant to step out. As defendant exited, he attempted to remove a backpack that had been on the floorboard between his legs. However, Vicary stated, "[Y]ou can leave your stuff in there," and defendant left the backpack. Vicary then explained to defendant that the vehicle had to be towed and that Pokorny had a suspended license. He also asked defendant if he had any weapons on him. Defendant did not answer and walked away from Vicary toward Bucco's squad car, where Pokorny was standing.

¶ 22    The recordings showed that Pokorny and defendant stood near Bucco's squad car, where they spoke to him through an open window. Vicary returned to Pokorny's vehicle to conduct an inventory search. He began his search in the driver's seat area of the vehicle. Vicary shined his flashlight in the area of the steering wheel and dashboard, lifted a cover on the driver's seat, looked

under the driver's seat, and opened a compartment in the center console. He lifted several items out of the center console and then quickly sifted through the numerous items inside. After closing the compartment, Vicary continued his search of the center console area. Approximately one minute into his search, he picked up a glass jar near the front of the center console area and audibly noted it had "white residue all in it."

¶ 23　　　　Vicary next moved to the driver's side back seat area of Pokorny's vehicle, where he noted the presence of some large speakers. He then opened the vehicle's trunk and stated that it contained golf clubs, pool cues, and food items. Vicary continued his search by opening the rear passenger side door. He shined his flashlight inside the vehicle and moved what appeared to be an item of clothing on the seat. He did not audibly note the presence of any items. Finally, Vicary opened the front passenger side door and shined his flashlight on the floorboard and between the passenger's seat and the center console. Vicary opened the backpack that was sitting on the passenger side floorboard and found the gun. Shortly thereafter, the officers detained and then arrested defendant as he stood near Bucco's squad car.

¶ 24　　　　Montoya's police report showed that she responded to the scene of the traffic stop as defendant was being handcuffed and defendant was placed in the back of her squad car. She read defendant his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), and, thereafter, defendant made statements indicating the backpack in Pokorny's vehicle was his, he knew the gun was in the backpack, and "he bought [the gun] from a guy named 'John.' "

¶ 25　　　　The evidence further showed that a City of Pekin ordinance provided for the seizure and impoundment of vehicles "used in connection with" a driving while license suspended violation. Pekin City Code § 5-10-2-1-4(a)(1) (adopted Jan. 24, 2023). Additionally, policies of the Pekin Police Department required that when a vehicle is towed, officers "complete a Tow

Form" that included "a description of property within the vehicle." With respect to vehicle inventories, the department's policies stated as follows:

> "All property in a stored vehicle shall be inventoried and listed on the Tow Report. This includes the trunk and any compartments or containers, even if closed and/or locked. Members conducting inventory searches should be as thorough and accurate as practical in preparing an itemized inventory. These inventory procedures are for the purpose of protecting an owner's property while in police custody, to provide for the safety of officers, and to protect the Department against fraudulent claims of lost, stolen, or damaged property."

The department's policies also addressed the removal of items from an impounded vehicle, stating as follows:

> "Unless it would cause an unreasonable delay in the completion of a vehicle impound/storage or create an issue of officer safety, officers should make reasonable accommodations to permit a driver/owner to retrieve small items of value or personal need (*e.g.* cash, jewelry, cell phone, prescriptions) which are not considered evidence or contraband."

¶ 26 At the suppression hearing, defendant's counsel argued that Vicary was not authorized to tell defendant to leave his backpack in the vehicle and that, at the time he did so, "there was no probable cause to search a passenger." He also discounted Vicary's assertion that he told defendant to leave his backpack for safety reasons, pointing out that defendant was never patted down for weapons upon exiting Pokorny's vehicle. Counsel agreed that "if there's probable cause to search, you search whatever is in the passenger compartment of the car." However, he maintained that if defendant was already out of the vehicle with his backpack, it was not subject

to being searched. Additionally, counsel argued that the officers violated the Pekin Police Department policy for inventory searches by failing to keep a list of the items in the vehicle. Counsel asserted such inaction suggested the officers had some other motive for the search than simply taking an inventory of items.

¶ 27 In response, the State argued that officer safety was a valid basis for Vicary to direct defendant to leave the backpack in the vehicle when he exited. It also asserted that Vicary's search of the vehicle began as a valid inventory search and that it became a search based on probable cause once Vicary found the jar with the white residue that he suspected was an illegal substance. It maintained that, during a search based on probable cause, Vicary could "search anything that's in the car at that time as well as the occupants that were in the car." Finally, the State asserted that even if Vicary could not lawfully have ordered defendant to leave the backpack in the car, "inevitable discovery would have led to finding of the gun." It argued as follows: "[O]nce [the officers] had probable cause to search that car, they can search that bag. It had been in the car when the drugs were in the car during that traffic stop, so there is inevitable discovery."

¶ 28 The trial court took the matter under advisement. In March 2025, it issued oral and written rulings, denying defendant's motion to suppress evidence. The court found Vicary conducted an inventory search consistent with Pekin Police Department policy up to the point that he located the glass jar with the white residue. It stated Vicary "abandoned" the inventory search upon finding the glass jar and, later, the weapon. The court concluded that, consistent with police department policy, Vicary's search was initially "thorough"; however, it became less so after he found the glass jar and moved to the back seat and trunk. The court concluded that Vicary never completed the inventory search and pointed out that he did not "create a list to protect driver and department from claims of theft or lost property."

¶ 29　　　　Nevertheless, consistent with the State's argument, the trial court found Vicary had probable cause to search the vehicle for contraband upon finding the glass jar with the white substance. It determined that based upon Vicary's training and experience, he "had a reasonable belief that the substance was an illegal drug," *i.e.*, methamphetamine. The court further found as follows:

> "The stop was lawful. It was 2 [a.m.] when the stop occurred. The gas station and industrial area are high crime areas. The suspect car pulled over for seconds before pulling away at the gas station. Based upon the officer's training and experience, the appearance of the glass jar was consistent with illegal drugs. The decision to search the vehicle for other contraband was reasonable."

¶ 30　　　　The trial court emphasized that the glass jar was found in an open area of the center console and that it was accessible by both Pokorny and defendant. It also found that Vicary asked defendant to leave his backpack in the car due to safety concerns, and it found those concerns were objectively reasonable. In setting forth its oral ruling, the court noted that the evidence showed Vicary subsequently "gave up" on conducting "a pat-down" of defendant. While stating that decision was "probably not a best practice," it also concluded such circumstances did not "undermine the objective nature of leaving the bag in there for safety purposes." The court further concluded that "[t]he bag was proximal to the glass jar" and that it was reasonable for the officers to search the "bag" even if it was presumed to belong to defendant or if defendant had removed it when exiting the vehicle for the inventory search. The court reasoned as follows: "The bag was in the vehicle with the suspected drugs. Officers would have inevitably searched the bag even if defendant took it out of the car with him due to its proximity to contraband."

¶ 31　　　　On March 19, 2025, defendant filed a motion to dismiss the indictment, arguing the

UPWF statute was unconstitutional as applied to him. He maintained that, under the test set forth in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), for evaluating gun laws, the UPWF statute violated the second amendment to the United States Constitution (U.S. Const., amend. II). According to defendant, his conduct in possessing a firearm was presumptively protected under the second amendment, and the State could not show the UPWF statute was analogous to and consistent with historically accepted restrictions on firearm possession. In particular, defendant maintained that his prior felony convictions were drug-related and nonviolent and did not involve the " 'improper use of a weapon.' " He supported his motion with his own affidavit and exhibits that contained information about his criminal history.

¶ 32            In May 2025, the trial court heard and denied defendant's motion to dismiss. The matter then proceeded to a stipulated bench trial. The stipulated evidence included "a copy of the docket" in Peoria County case No. 11-CF-42, showing defendant's prior felony conviction for unlawful delivery of a controlled substance. The stipulated evidence further consisted of evidence presented at the suppression hearing, including the witness testimony from Bucco, Vicary, and defendant; the photograph of the firearm; recordings from the officers' body cameras; and Montoya's police report. Following argument by the parties, the court found defendant guilty of the charged offense.

¶ 33            In July 2025, defendant filed a posttrial motion for a new trial or a motion for a judgment of acquittal. He argued the trial court erred in denying his motion to suppress evidence and his motion to dismiss the indictment. Defendant also argued the evidence in the case failed to establish his guilt beyond a reasonable doubt. Following a hearing the same month, the court denied defendant's posttrial motion and sentenced him to three years and two months in prison.

¶ 34            This appeal followed.

¶ 35          II. ANALYSIS

¶ 36       A. Motion to Suppress Evidence

¶ 37   On appeal, defendant first argues that the trial court erred in denying his motion to suppress evidence. He contends the warrantless search of his backpack circumvented fourth amendment protections (see U.S. Const., amend. IV) because (1) Vicary lacked the authority to order him to leave his backpack in Pokorny's vehicle immediately prior to the inventory search and (2) the inventory search did not comply with police department policies and was invalid. According to defendant, both the gun evidence and his statements to the police should have been suppressed, and his UPWF conviction should be reversed.

¶ 38   "A circuit court's ruling on a motion to suppress presents questions of both fact and law." *People v. Manzo*, 2018 IL 122761, ¶ 25. When considering such rulings on appeal, we apply a two-part standard of review. *People v. Molina*, 2024 IL 129237, ¶ 17. Initially, the court's factual findings will be reversed only if they are against the manifest weight of the evidence. *Id.* "A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." (Internal quotation marks omitted.) *People v. Dunmire*, 2019 IL App (4th) 190316, ¶ 35. The court's ultimate determination of whether suppression is warranted is subject to *de novo* review. *Molina*, 2024 IL 129237, ¶ 17.

¶ 39   Both the United States and Illinois Constitutions protect against unreasonable searches and seizures. See U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6; see also *People v. Timmsen*, 2016 IL 118181, ¶ 9 ("The fourth amendment to the United States Constitution, which applies to the states under the fourteenth amendment, and article I, section 6, of the Illinois Constitution protect people against unreasonable searches and seizures."). "[S]topping a vehicle

and detaining its occupants constitute a 'seizure' within the meaning of the fourth amendment." *Timmsen*, 2016 IL 118181, ¶ 9. Such seizures are analyzed under the principles set forth in *Terry v. Ohio*, 392 U.S. 1 (1968), which authorize a brief, investigatory stop of a person when a police officer has "a reasonable, articulable suspicion that criminal activity is afoot." (Internal quotation marks omitted.) *Timmsen*, 2016 IL 118181, ¶ 9. "A police officer may stop a vehicle if he has a reasonable suspicion that the vehicle has committed a traffic violation." *Dunmire*, 2019 IL App (4th) 190316, ¶ 72.

¶ 40 Additionally, "a search is *per se* unreasonable if conducted without a warrant supported by probable cause and approved by a judge or magistrate." *People v. Hill*, 2020 IL 124595, ¶ 20. However, there are exceptions to the warrant requirement, including one for automobiles "because their transient nature often renders it impracticable to secure a warrant before the automobile escapes the jurisdiction in which the warrant must be sought." *Id.* ¶ 21. "Under the automobile exception, law enforcement officers may undertake a warrantless search of a vehicle if there is probable cause to believe that the automobile contains evidence of criminal activity that the officers are entitled to seize." (Internal quotation marks omitted.) *Molina*, 2024 IL 129237, ¶ 20.

¶ 41 "Probable cause requires a showing that the totality of the facts and circumstances known to the officer at the time of the search would justify a reasonable person in believing that the automobile contains contraband or evidence of criminal activity." *People v. Webb*, 2023 IL 128957, ¶ 25. "Because probable cause deals with probabilities, not certainties, probable cause does not require an officer to rule out any innocent explanations for suspicious facts." *Id.* Additionally, "[i]n determining whether probable cause exists, officers may rely on their law-enforcement training and experience to make inferences that might evade an untrained

civilian." *Hill*, 2020 IL 124595, ¶ 23.

¶ 42    Another exception to the fourth amendment's warrant requirement is "[a]n inventory search of a lawfully impounded vehicle." *People v. Gipson*, 203 Ill. 2d 298, 304 (2003). The objectives of an inventory search are "(1) protection of the owner's property; (2) protection of the police against claims of lost or stolen property; and (3) protection of the police from potential danger." *Id.* To be valid, an inventory search must satisfy three requirements:

> "(1) the original impoundment of the vehicle must be lawful [citation]; (2) the purpose of the inventory search must be to protect the owner's property and to protect the police from claims of lost, stolen, or vandalized property and to guard the police from danger [citation]; and (3) the inventory search must be conducted in good faith pursuant to reasonable standardized police procedures and not as a pretext for an investigatory search." *People v. Hundley*, 156 Ill. 2d 135, 138 (1993).

¶ 43                    1. *Vicary's Request That Defendant*

*Leave the Backpack in the Vehicle*

¶ 44    As stated, defendant initially argues that his fourth amendment rights were violated because Vicary ordered him to leave his backpack in Pokorny's vehicle immediately prior to the inventory search. He contends he exercised possession over the backpack and notes that it was positioned between his legs while he was in the vehicle. According to defendant, because of these circumstances, he should have been "afforded the same protections to the bag that would [have been] afforded to his person." Defendant suggests that his backpack should have received heightened privacy protections, given its proximity to him in the vehicle and his effort to exercise control over it.

¶ 45                    a. Relevant Case Authority

¶ 46        Here, the trial court determined that the search of Pokorny's vehicle began as a lawful inventory search that became a probable cause search after Vicary found the glass jar with suspected methamphetamine. Regarding vehicle searches, the United States Supreme Court has held that "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982). Although probable cause to search a vehicle does not justify a body search of a passenger (*United States v. Di Re*, 332 U.S. 581, 587 (1948)), a police officer with probable cause to search a vehicle "may inspect passengers' belongings found in the car that are capable of concealing the object of the search." *Wyoming v. Houghton*, 526 U.S. 295, 307 (1999).

¶ 47        The Supreme Court's decision in *Houghton* is instructive to both the issue presented and the parties' arguments. In *Houghton*, a police officer conducted a traffic stop of a vehicle with a male driver and two female passengers. *Id.* at 297-98. During the stop, the officer noticed a hypodermic syringe in the driver's shirt pocket, which the driver admitted was associated with drug use. *Id.* at 298. A probable cause search of the vehicle followed. During that search, the police also searched a purse that was on the back seat and claimed by one of the female passengers. *Id.* In the purse, the police found drug paraphernalia and methamphetamine, and they arrested the purse's owner. *Id.*

¶ 48        On review, the Supreme Court upheld the search of the purse, stating "that police officers with probable cause to search a car may inspect passengers' belongings found in the car that are capable of concealing the object of the search." *Id.* at 307. The court reasoned that it had previously "read the historical evidence to show that the Framers would have regarded as reasonable (if there was probable cause) the warrantless search of containers within an

automobile." (Emphasis omitted.) *Id.* at 300. It found that determination applied to all containers within a vehicle, "without qualification as to ownership." *Id.* at 301.

¶ 49 The Supreme Court also found that "the balancing of the relative interests weigh[ed] decidedly in favor of allowing searches of a passenger's belongings." *Id.* at 303. It stated that "[p]assengers, no less than drivers, possess a reduced expectation of privacy with regard to the property that they transport in cars." *Id.* In particular, the Court determined that the "package search" at issue "differ[ed] substantially" from the circumstances at issue in *Di Re*, where it had "held that probable cause to search a car did not justify a body search of a passenger." *Id.* The Court stated as follows:

> "[*Di Re*] turned on the unique, significantly heightened protection afforded against searches of one's person. 'Even a limited search of the outer clothing . . . constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience.' [Citation.] Such traumatic consequences are not to be expected when the police examine an item of personal property found in a car." *Id.*

The Court concluded that while a passenger's privacy expectations to personal property are "considerably diminished, the governmental interests *** are substantial." *Id.* at 304. Specifically, "[e]ffective law enforcement would be appreciably impaired without the ability to search a passenger's personal belongings when there is reason to believe contraband or evidence of criminal wrongdoing is hidden in the car." *Id.*

¶ 50 In a concurring opinion, Justice Breyer emphasized that the rule announced by the Supreme Court applied only to containers found within automobiles and did not extend to the search of a person. *Id.* at 308 (Breyer, J., concurring). He also characterized purses as "special

- 17 -

containers," which might, in his view, warrant a different result if "attached" to a person. *Id.*

> "[A]lso important, is the fact that the container here at issue, a woman's purse, was found at a considerable distance from its owner, who did not claim ownership until the officer discovered her identification while looking through it. Purses are special containers. They are repositories of especially personal items that people generally like to keep with them at all times. So I am tempted to say that a search of a purse involves an intrusion so similar to a search of one's person that the same rule should govern both. However, given this Court's prior cases, I cannot argue that the fact that the container was a purse automatically makes a legal difference, for the Court has warned against trying to make that kind of distinction. [Citation.] But I can say that it would matter if a woman's purse, like a man's billfold, were attached to her person. It might then amount to a kind of 'outer clothing,' [citation], which under the Court's cases would properly receive increased protection. [Citation.] In this case, the purse was separate from the person, and no one has claimed that, under those circumstances, the type of container makes a difference. For that reason, I join the Court's opinion." (Emphasis omitted.) *Id.*

¶ 51 On appeal, defendant effectively relies on Justice Breyer's concurrence in *Houghton* in arguing that his backpack in the present case should have been afforded the same protections as afforded to his person. He contends that no Illinois case addresses the precise questions at issue on appeal, which he characterizes as "whether an officer can order an individual to leave a personal bag in the vehicle during a search, or whether that would constitute a search of their person." Accordingly, defendant cites cases from other jurisdictions. He relies most heavily on *State v. Boyd*, 64 P.3d 419, 427 (Kan. 2003), where the Kansas Supreme Court found that a

vehicle passenger's purse was entitled to increased protections because it was in the passenger's possession and under her control. See *State v. Groshong*, 135 P.3d 1186, 1189 (Kan. 2006) (wherein the Kansas Supreme Court noted that, in *Boyd*, it had relied on Justice's Breyer's concurring opinion in *Houghton* in "recogniz[ing] a heightened privacy interest in purses when they are attached to the owner").

¶ 52        In *Boyd*, 64 P.3d at 421, the police conducted a traffic stop of a vehicle in which Boyd was a passenger and the driver consented to a search of the vehicle. Boyd was asked to get out of the vehicle and, as she exited, she reached for her purse to take with her. *Id.* An officer told her to leave the purse in the vehicle, and she complied. *Id.* While outside of the vehicle, an officer asked Boyd if the purse was hers and if he could search it. *Id.* Boyd stated the purse was hers and declined the request to search. *Id.* During the vehicle search, an officer found a crack pipe in the center console ashtray. *Id.* He then searched Boyd's purse, which was laying on the floorboard in front of the console, finding a substance later confirmed to be crack cocaine. *Id.* Boyd was arrested and charged with a drug-related offense. *Id.*

¶ 53        On review, the Kansas Supreme Court held the search of Boyd's purse violated her fourth amendment right against unreasonable searches and seizures. *Id.* at 427. It found *Houghton* was factually different from the case before it but referenced Justice Breyer's concurrence, including his assertion that purses constitute " 'special containers' " and his suggestion that his view of the case would have been different if the purse had been " 'attached' " to the passenger's person. *Id.* at 424 (quoting *Houghton*, 526 U.S. at 308 (Breyer, J. concurring)). The court concluded that there was "no question the purse was Boyd's personal property, in her possession, and under her control," pointing out that she had attempted to take it with her when she left the vehicle. *Id.* at 427. It concluded that, under such circumstances, "her purse was entitled to the same

increased protection from search and seizure as afforded to her person." *Id.*

¶ 54　　　　The Kansas Supreme Court also explicitly distinguished *Houghton*, noting that unlike in that case, Boyd did not voluntarily leave her purse in the vehicle and the officer did not have probable cause to search before entering the vehicle. *Id.* It stated that the officer did not have probable cause to search Boyd or her purse when Boyd was told to exit the vehicle and, thus, "[t]he officer had no right to order [Boyd] to leave her purse in the car." *Id.* It further stated as follows:

> "The protection of the Fourth Amendment cannot be defined at the discretion of a law enforcement officer. The heightened privacy interest and expectation in the present case is sufficient to tip the balance from governmental interest in effective law enforcement, which outweighed the privacy interest in *Houghton* where the purse was voluntarily left in the back seat unclaimed. We hold that where a passenger is told by a police officer to get out of a lawfully stopped vehicle and in response to the officer's order to leave her purse in the vehicle, puts the purse down and exits the vehicle, a subsequent search of the purse as part of a search of the vehicle violates the passenger's Fourth Amendment right against unreasonable search and seizure." *Id.*

¶ 55　　　　Defendant urges us to follow *Boyd* and contends that other out-of-state cases have reached similar holdings. First, he points to *State v. Newsom*, 979 P.2d 100, 100-02 (Idaho 1998), where the Idaho supreme court held the search of a purse was invalid where an officer had ordered the passenger to leave the purse in the vehicle prior to a search incident to the arrest of the driver. Initially, the court cited *New York v. Belton*, 453 U.S. 454, 460-61 (1981), where the United States Supreme Court announced the rule that when the police lawfully arrest the occupant of a vehicle, they may search the passenger compartment of the vehicle incident to the arrest, along with the

- 20 -

contents of any containers found within the passenger compartment. *Newsom*, 979 P.2d at 101. The *Newsom* court found, however, that *Belton* did not authorize the search of another occupant of the vehicle. *Id.* at 102. It concluded that because the passenger in the case before it was holding her purse on her lap when she was asked to step out of the vehicle, her purse "was entitled to as much privacy and freedom from search and seizure as the passenger herself." *Id.*

¶ 56    Next, in *State v. Tognotti*, 2003 ND 99, ¶ 3, 663 N.W.2d 642, 643-44, the police arrested the passenger of a vehicle driven by the defendant. After asking the defendant and other occupants to exit the vehicle, an officer searched the vehicle, as well as the defendant's purse, "which was lying on the driver's side of the front seat." *Id.* In the purse, the officer discovered drug paraphernalia and methamphetamine. *Id.*

¶ 57    On review, the North Dakota Supreme Court found that "an arresting officer's search of a purse belonging to a nonarrested occupant which is voluntarily left in the vehicle is a valid search incident to the arrest of a passenger in the vehicle." *Id.* ¶ 14. The court noted, however, that "no testimony was taken regarding whether [the defendant] voluntarily left her purse in the vehicle when she exited or whether the officer instructed her to leave the purse in the vehicle." *Id.* ¶ 15. It concluded that whether the purse was left voluntarily was relevant and dispositive of the defendant's motion to suppress evidence, relying on the holdings in *Newsom* and *Boyd*, as well as Justice Breyer's concurrence in *Houghton*. *Id.* ¶¶ 15-21. The court stated as follows:

> "A purse, like a billfold, is such a personal item that it logically carries for its owner a heightened expectation of privacy, much like the clothing the person is wearing. We are, therefore, persuaded by the foregoing court decisions that the Fourth Amendment is violated when an officer directs that a purse be left in the vehicle and then proceeds to search the purse incident to the arrest of another

passenger in the vehicle." *Id.* ¶ 20.

Ultimately, the court remanded the matter with instructions that the trial court hold an evidentiary hearing on whether the defendant left her purse in the vehicle at the officer's direction. *Id.* ¶ 22.

¶ 58          Finally, in *State v. Nelson*, 948 P.2d 1314, 1315 (Wash. Ct. App. 1997), the police conducted a traffic stop of a vehicle driven by Nelson and arrested a passenger in the vehicle on a valid warrant. Following the arrest, an officer ordered Nelson out of the vehicle and told her to leave her purse, which had been between her legs. *Id.* The officer then searched the vehicle and the purse, finding suspected methamphetamine and drug paraphernalia in the purse. *Id.*

¶ 59          On review, the Washington appellate court found the search of Nelson's purse was invalid. *Id.* at 1316. It concluded the search would not have been justified if the purse was outside of the vehicle and on the defendant's person and that a dispositive concern in the case was the amount of control the "non-arrested" person maintained over his or her personal property. *Id.* at 1315-16. The court further stated as follows:

> "[I]f the police do not believe a person presents a danger, they cannot search the person and their clothing. This would include a purse they are carrying. Although *** Nelson was not carrying her purse, she was prevented from doing so by [the officer]. Up to the time she exited the truck, she had kept control of the purse by keeping it between her legs." *Id.* at 1316.

¶ 60          We note that other out-of-state cases have reached different conclusions regarding a passenger's personal belongings left in a vehicle prior to a search. In *State v. Steele*, 2000 S.D. 78, ¶ 2, 613 N.W.2d 825, 826, the driver of a vehicle was arrested during a traffic stop. Prior to a search of the vehicle incident to the driver's arrest, Steele, the passenger, was asked to exit the vehicle but told to leave her purse, which "was resting beside her on the front seat." *Id.* ¶ 3.

Ultimately, the officer searched the purse, finding plastic bags with residue that was later confirmed to be methamphetamine. *Id.*

¶ 61 The South Dakota Supreme Court held the search of Steele's purse was lawful. *Id.* ¶ 19. It cited *Belton* for the proposition that the fourth amendment permits the search of a purse that is inside a vehicle when the search is incident to a lawful arrest of the driver. *Id.* ¶ 5 (citing *Belton*, 453 U.S. 460-61). The court noted that "*Belton* held that the area of the arrestee's immediate control always includes the passenger compartment of the vehicle and its containers," and it found that Steele's purse, which had been lying on the front seat within 12 to 18 inches from the driver at the time of his arrest, fit within *Belton*'s definition of a container *Id.* ¶ 6. It pointed out that the rationale for the *Belton* rule included the need to remove weapons that an arrestee might seek and to prevent the concealment or destruction of evidence, and it rejected Steele's argument that the officer's order to leave the purse was unconstitutional. *Id.* ¶¶ 7-8. The court stated as follows: "[I]f Steele's argument prevailed and passengers were permitted to remove containers from the vehicle prior to the search, the *Belton* rule would be nullified. Weapons and contraband, the objects of a lawful search, would be removed from the vehicle and the arrestee able to hide these items from police." *Id.* ¶ 8.

¶ 62 The *Steele* court also concluded that "[a]dherence to Steele's argument would permit her to alter the facts after [the driver's] arrest." *Id.* ¶ 10. It stated:

> "If no container existed within the vehicle at the time of [the driver's] arrest, *Belton* would only permit a search of the vehicle's interior. Since a container did exist within the vehicle at that point in time, *Belton* authorizes a search of that container. Steele may not, by attempting to remove her purse, change the facts present to law enforcement *at the time justification for the search was triggered*." (Emphasis

added.) *Id.*

The court further referenced *Houghton* and its findings that, during a search based on probable cause, the police may search a passenger's belongings for contraband that is " ' "in" the car.' " *Id.* ¶ 17 (quoting *Houghton*, 526 U.S. at 302). It stated that, like *Houghton*, "Steele's purse was ' "in" the car' when she attempted to remove it from the search." *Id.*; see *State v. Edwards*, 2024 S.D. 62, ¶ 25, 13 N.W.3d 199, 205 (stating that a vehicle passenger's "purse was not entitled to a heightened expectation of privacy and was subject to the same search conditions as any other container found inside of the vehicle that was capable of concealing contraband").

¶ 63    Also relevant is *State v. Roe*, 90 P.3d 926 (Idaho Ct. App. 2004). There, the police conducted a vehicle search incident to the arrest of a passenger. *Id.* at 929. When ordering the other occupants of the vehicle to exit, the police directed one of the passengers to leave a pair of blue jean shorts he was carrying in the vehicle. *Id.* The police searched the shorts and found marijuana. *Id.* On review, the Idaho court of appeals considered whether the search of the passenger's shorts was valid as part of the search incident to arrest. *Id.* at 932. Concluding that it was, the court distinguished *Newsom*, finding that it did not read that case "to extend constitutional protection to any and all items taken from a vehicle by a passenger." *Id.* at 933. The court stated:

> "We agree that a purse and perhaps a billfold are items that can be considered part of the person, much like the clothing a person is wearing. On the other hand, under the facts of this case, a pair of shorts not being worn at the time and which are not ordinarily carried with a person is more akin to a container found inside a vehicle. We conclude that a passenger cannot, upon being asked to exit a vehicle, extract various containers from the vehicle to avoid search of the containers." *Id.*

¶ 64    Finally, we note *State v. Leatham*, 2025 UT App 194, 584 P.3d 336, a decision of

the Utah appellate court. In that case, the police conducted a traffic stop of a vehicle and discovered the driver had no valid license or car insurance. *Id.* ¶¶ 2-3. They determined that the car had to be impounded and inventoried. *Id.* ¶ 3. Prior to the inventory, Leatham, a passenger, attempted to remove a small black bag that resembled a "toiletry bag" from the vehicle, but an officer told him to leave it in the vehicle. *Id.* ¶¶ 4-6. During the inventory, the police searched the bag, found drugs and drug paraphernalia, and arrested Leatham. *Id.* ¶¶ 6-7.

¶ 65        On review, Leatham argued that the inventory search should not have extended to his personal property and that such a search was limited to items that would remain in the car after impound. *Id.* ¶ 13. The Utah appellate court disagreed, finding that, in the context of an inventory search, officers have no obligation to allow passengers to remove personal items from the vehicle "absent an express provision in the policy allowing the removal of personal items prior to an impound." *Id.* ¶ 15. The court reasoned that the caretaking functions that arise from a vehicle impound—protecting the owner's property, shielding the police against claims or disputes regarding lost or stolen property, and ensuring police safety—were "furthered by allowing officers to inventory personal items found in impounded vehicles." *Id.* The court noted the danger that a passenger might remove property actually belonging to the driver, which would subject the police "to the very kind of claim against which the inventory search doctrine is designed to protect." (Internal quotation marks omitted.) *Id.*

¶ 66        The Utah appellate court further stated that "[t]he point of an impound inventory is to identify and catalogue those items that are present in the vehicle when the State takes control of it." *Id.* ¶ 19. It concluded that allowing drivers or passengers to take whatever they wanted from the vehicle before an inventory was conducted would be "at odds" with the inventory purposes of protecting the property in the vehicle, shielding state actors from liability for mishandling property,

and ensuring the safety of police officers. *Id.* The court further stated as follows:

"What Leatham has essentially done is challenge the constitutionality of a vehicle inventory by making it about who the items belong to rather than the fact that the items are in the vehicle. But Leatham cannot prevail on his claim by redefining a vehicle inventory (namely, an accounting of items in a vehicle at the time of impound) into something it isn't (namely, a warrantless search of personal property). ***

In sum, the car was subject to impound and inventory because the driver lacked a valid license. In conducting the inventory, the officers were under no obligation—pursuant to either the [police department's] policy or pursuant to the United States Constitution—to release any item in the car prior to conducting the inventory." *Id.* ¶¶ 19-20.

¶ 67                                     b. This Case

¶ 68        Initially, we find the case authority defendant relies upon is distinguishable. Most notable is the fact that this case does not involve defendant's attempt to remove a purse or billfold from Pokorny's vehicle. Rather, defendant tried to exit the vehicle with a backpack, which is also referred to in the record as a "bag" or "bookbag." Each of the cases defendant cites specifically relies on the fact that the item searched was a purse and found purses deserving of heightened protections, similar to the search of someone's person.

¶ 69        Defendant does not argue that his backpack in the instant case is the equivalent of a purse. Rather, his arguments suggest that it is not the type of container that matters when determining whether his backpack was entitled to heightened protection but, instead, the distance of the backpack from his body and whether he exercised control over the backpack. In arguing that

distance and control are dispositive factors, he relies on Justice Breyer's concurrence in *Houghton*. However, in his concurrence, Justice Breyer explicitly described "[p]urses as special containers" and "repositories of especially personal items" that might "amount to a kind of outer clothing" if "attached" to an individual's person. (Internal quotation marks omitted.) *Houghton*, 526 U.S. at 308 (Breyer, J., concurring). Given such comments, we cannot conclude that the type of container is an irrelevant consideration.

¶ 70       Further, we note that Justice Breyer's concurrence is not the law and that the *Houghton* majority opinion was supported by five votes absent Justice Breyer's concurrence. *Id.* at 296 (majority). Significantly, the *Houghton* majority described the search of the purse in that case as a "package search" and characterized it as substantially different from the circumstances of a body search. *Id.* at 303.

¶ 71       We are also more persuaded by the rationale set forth in *Steele*, *Roe*, and *Leatham* than the rationale of defendant's cited cases. Again, the container at issue was a backpack positioned on the front passenger floorboard of the vehicle near defendant. It was not a purse or billfold attached to his person. See *Roe*, 90 P.3d at 933 (distinguishing a pair of shorts not presently being worn by a passenger from a purse or billfold). Also, the backpack was "in" Pokorney's vehicle at the time the "justification for the search was triggered." See *Steele*, 2000 S.D. 78, ¶¶ 10, 17, 613 N.W.2d at 828, 831. The inventory search in this case was justified by the officers' decision to impound Pokorny's vehicle, and that decision was made before defendant was asked to exit the vehicle and tried to remove the backpack.

¶ 72       We find it significant that unlike *Boyd*, which involved a consent search, or *Newsom*, *Tognotti*, and *Nelson*, which involved searches incident to arrest, this case involved an inventory search pursuant to a vehicle impound. Evidence in the case showed the Pekin Police

Department had policies that provided for an inventory of "[a]ll property" in an impounded vehicle, including inside "any compartments or containers." Additionally, those policies provided for the driver's or owner's retrieval of only "small items of value or personal need (*e.g.* cash, jewelry, cell phone, prescriptions)." The evidence does not show Bucco or Vicary had any obligation to release defendant's backpack before conducting the inventory. Rather, they were tasked with identifying items in the vehicle at the time they took control of it. Defendant's backpack was in the vehicle at that time and, thus, subject to the Pekin Police Department inventory policies. Allowing passengers to remove items from the vehicle prior to the inventory would defeat the purposes of such a search. *Leatham*, 2025 UT App 194, ¶¶ 19-20, 584 P.3d at 342-43.

¶ 73          Accordingly, we find this case unlike those cases relied upon by defendant, which equate the search of a purse with the search of an individual's person or hold that an officer may not create a right to search a purse by ordering a vehicle occupant to leave it in a vehicle. Here, defendant's backpack was not a purse and not attached to his person, and it was subject to the inventory search of Pokorny's vehicle at the time defendant attempted to remove it.

¶ 74                                    c. Officer Safety

¶ 75          Finally, we also note that none of the cases defendant cites address the issue of officer safety, which, in this case, was Vicary's stated basis for distancing defendant from the backpack. Although defendant acknowledges that Vicary could have briefly seized his backpack if he believed defendant was armed and dangerous, he contends that general officer safety concerns did not authorize Vicary to order him to leave his backpack in the car prior to the inventory search. Further, defendant argues that the evidence fails to show that Vicary had a legitimate and reasonable fear for his safety during the underlying traffic stop.

¶ 76          As to this point, the State cites *Meyer v. State*, 535 P.3d 635 (Idaho Ct. App. 2023),

which it contends is instructive regarding whether the police may restrict a vehicle passenger's access to personal property during a traffic stop. There, Meyer was a passenger in a vehicle stopped for a traffic violation. *Id.* at 637. After the driver gave the police consent to search the vehicle, the driver and Meyer were directed to exit the vehicle. *Id.* "Meyer then agreed to set her 'large purse' down outside the vehicle as a safety precaution in lieu of consenting to a search of the purse or leaving it in the vehicle." *Id.* She later consented to " 'a quick search' " of her purse so that she could retrieve a lighter from inside it. *Id.* During that search, officers found a bag containing heroin. *Id.* Meyer later raised the argument that she was entitled to have the evidence against her suppressed because she was unlawfully separated from her purse " 'without suspicion of specific danger.' " *Id.*

¶ 77      In rejecting Meyer's argument, the Idaho appellate court stated that, during a lawful traffic stop, police officers may take " 'negligibly burdensome precautions' necessary 'to complete [their] mission safely.' " *Id.* at 640 (quoting *Rodriguez v. United States*, 575 U.S. 348, 355-56 (2015)). "Such negligibly burdensome precautions include, as a matter of course, ordering all the occupants of a vehicle to exit and obtaining their identification to conduct a warrants check." *Id.*; see *Maryland v. Wilson*, 519 U.S. 408, 415 (1997) (holding "that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop"); *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) (holding that the police may order a driver to exit a vehicle during a traffic stop and describing such an order as a *de minimis* intrusion). The *Meyer* court stated that in establishing the rules for traffic stops, courts apply a balancing test that "weighs the 'balance between the public interest and the individual's right to personal security free from arbitrary interference by officers.' " *Meyer*, 535 P.3d at 640 (quoting *Wilson*, 519 U.S. at 413-15).

¶ 78      The *Meyer* court found that the "public interest side of the scale" included

"the 'legitimate and weighty' government interest in officer safety." *Id.* It pointed out that the United States Supreme Court had recognized that traffic stops can prove to be dangerous for the police, particularly when faced with more than one occupant of a vehicle. *Id.* at 640-41. Additionally, risks to officers stem from the possibility that the police "might discover evidence of more serious crimes during a routine traffic stop" and the fact that any vehicle occupant might "harbor a motivation to use violence to avoid apprehension" for the more serious crime. *Id.* at 641.

¶ 79        By contrast, the personal security side of the scale concerned "the intrusion upon a passenger's possessory interest in personal effects." *Id.* The *Meyer* court identified the crucial issue as "not the intrusiveness of the overall seizure, but rather the 'incremental intrusion' occasioned by the proposed practice in relation to an individual already subject to a lawful seizure." *Id.* (quoting *Mimms*, 434 U.S. at 109). The court found that during a lawful traffic stop, an officer seizes not only the occupants of the vehicle but also, incidentally, "any effects the person has in his or her possession." *Id.* It reasoned that because a passenger's personal belongings "are already subject to a level of governmental intrusion by virtue" of the stop, "a passenger can reasonably expect *some* restrictions on accessing property during the stop." (Emphasis in original.) *Id.* The court found such was especially true when the personal property was a container that could conceal weapons. *Id.* It concluded as follows:

> "The ostensible purpose of removing passengers from a vehicle during a traffic stop is to allow officers to monitor the passengers while also separating them from any dangerous articles potentially present in the vehicle. Allowing an occupant ordered from a vehicle to maintain possession of personal effects that could conceal weapons diminishes the safety benefit garnered by lawfully removing the occupant from the vehicle." *Id.*

¶ 80    The *Meyer* court pointed out "that officer safety interests can outweigh *de minimis* incremental intrusions against the occupants of an already lawfully stopped vehicle." (Internal quotation marks omitted.) *Id.* It concluded that "requiring a passenger lawfully ordered to exit a vehicle during a lawful traffic stop to set aside a purse, absent consent to search it, is a mere inconvenience eclipsed by legitimate officer safety concerns." *Id.* at 642.

¶ 81    We agree with the State that *Meyer* is instructive. As set forth above, traffic stops can be dangerous for police officers and present legitimate concerns for officer safety. Our own supreme court has noted that "[t]he risk to an officer is increased by the presence of passengers [citation], particularly when those passengers are outside the vehicle." *People v. Moss*, 217 Ill. 2d 511, 530-31 (2005). We further agree that separating a passenger from his or her belongings while the traffic stop is ongoing represents only a *de minimis* intrusion, where the passenger is already lawfully seized. See *People v. Walker*, 2013 IL App (4th) 120118, ¶ 47 (stating that in the context of a *Terry* stop, "officers were entitled to ensure their own safety, even in the absence of reason to believe [the] defendant was armed and dangerous, by preventing [the] defendant from accessing her purse during the encounter," although general officer safety concerns did not justify a search of the purse).

¶ 82    Accordingly, we find that to ensure his safety during the stop, Vicary could lawfully separate defendant from his backpack during the underlying encounter by ordering defendant to exit the vehicle without his backpack. Although a general concern for officer safety would not have justified a search of the backpack, for the reasons already stated, the backpack was subject to being inventoried pursuant to the policies of the Pekin Police Department. As discussed, it was a container in the car at the time the need for the inventory search arose. Additionally, the record shows that Vicary later developed probable cause to search the vehicle during the inventory search.

On review, defendant raises no challenge to Vicary's assertion of probable cause based on the discovery of the glass jar and its contents.

¶ 83   As stated, defendant also argues that Vicary had no legitimate or reasonable concern for his safety during the underlying stop. In particular, he contends that the officers allowed him to roam freely at the scene, without patting him down for weapons or instructing him to keep his hands out of his pockets. He also contends that he made no furtive movements and complied with the officers' requests.

¶ 84   Initially, although the officers did not pat down defendant or frisk him for weapons, we note that such actions would have required more than simply the concern for officer safety that justified separating him from his backpack. Rather, an "officer may subject [a] person to a limited search for weapons, commonly referred to as a 'frisk,' only if the officer reasonably believes that the person is armed and dangerous." *People v. Sorenson*, 196 Ill. 2d 425, 433 (2001); *Arizona v. Johnson*, 555 U.S. 323, 327 (2009) ("To justify a pat[ ]down *** during a traffic stop, *** the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous."). Here, Vicary could have directed defendant to leave his backpack based on officer safety concerns without having the reasonable suspicion necessary to warrant the more significant intrusion of a pat down for weapons.

¶ 85   Finally, we agree with the trial court's finding that Vicary's officer safety concerns were objectively reasonable. The record shows the traffic stop occurred during the early morning hours at an unpopulated, "high crime" location. Defendant was upset about the stop and, at times, uncooperative, and only two officers were initially present at the scene. At various points, both Bucco and Vicary were engaged with matters related to the stop, such that their attention was diverted from Pokorny and defendant. Accordingly, defendant's claim that the underlying stop

posed no legitimate concern for officer safety lacks merit.

¶ 86                             2. *The Inventory Search*

¶ 87        Next, defendant challenges the inventory search as invalid from its inception because it was not conducted in compliance with Pekin Police Department policies. Specifically, he asserts that the search was neither thorough nor aimed at producing an inventory list. Defendant complains that, in searching the front driver's side area of Pokorny's vehicle, Vicary looked under a seat cover, "a place where personal items ordinarily would not be stored"; shined a flashlight under the driver's seat but did not reach under the seat or document any items; shined a flashlight in places where no items were located, such as the floorboard and dashboard areas; and sifted through items in the center console compartment without identifying the items.

¶ 88        As stated, inventory searches following the lawful impound of a vehicle are an exception to the fourth amendment's warrant requirement. *Gipson*, 203 Ill. 2d at 304. To be valid, the inventory search must satisfy the following three requirements:

> "(1) the original impoundment of the vehicle must be lawful [citation]; (2) the purpose of the inventory search must be to protect the owner's property and to protect the police from claims of lost, stolen, or vandalized property and to guard the police from danger [citation]; and (3) the inventory search must be conducted in good faith pursuant to reasonable standardized police procedures and not as a pretext for an investigatory search." *Hundley*, 156 Ill. 2d at 138.

¶ 89        In this case, defendant challenges only the third requirement. Regarding vehicle inventories, the Pekin Police Department's written policies require "[a]ll property in a stored vehicle" to be inventoried and "listed on the Tow Report." The areas to be inventoried included "the trunk and any compartments or containers, even if closed and/or locked." Additionally, the

policy directs that officers "should be as thorough and accurate as practical."

¶ 90 In denying defendant's motion to suppress, the trial court found Vicary conducted a valid inventory search, which was thorough and consistent with department policy, before and up to the point that he observed the glass jar with suspected methamphetamine and developed probable cause to search the vehicle. It concluded the character of Vicary's search changed upon finding the glass jar.

¶ 91 The evidence showed that Vicary began his inventory search in the front driver's side area of the vehicle, which the trial court described as "logical." It was dark out, and Vicary shined his flashlight in various locations around the driver's area, including the dashboard, the floorboard, and under the driver's seat. Although he did not make note of any items in those locations, the record fails to show that any items were present. Vicary also lifted a seat cover and sifted through items in the center console compartment. The lifting of the seat cover could be viewed as part of a thorough search of all property in the vehicle. Additionally, although Vicary did not make note of any of the specific items in the center console, in its written order, the court characterized the items as "junk." An opposite conclusion is not clearly evident. Significantly, Vicary observed the glass jar with suspected methamphetamine at only about one minute into the search. It is unknown how much more thoroughly he would have conducted the inventory had he not developed probable cause to search for contraband at that time. Further, the court's finding that the character of Vicary's search changed after he found the glass jar with white residue is supported by the record, which shows that Vicary engaged in a more cursory inspection of the back seat and trunk areas of the vehicle, failing to look inside containers located in the trunk area or to move and look underneath larger items.

¶ 92 We find the record, including the recording from Vicary's body camera, supports

the trial court's factual findings, which are not against the manifest weight of the evidence. We also find the court's ultimate determination that the inventory search was initially valid is supported by the record. As stated, defendant does not dispute that Vicary had probable cause to search after finding the glass jar. Accordingly, we find the court committed no error in denying defendant's motion to suppress evidence.

¶ 93                    B. Constitutionality of the UPWF Statute

¶ 94        On appeal, defendant next argues that his conviction should be "reversed outright" because the UPWF statute (720 ILCS 5/24-1.1(a) (West 2022)) is unconstitutional. He contends that under the analytical framework for evaluating firearm regulations in *Bruen*, the statute violates the second amendment to the United States Constitution, both on its face and as applied to him.

¶ 95        "Statutes are presumed constitutional, and the party challenging the constitutionality of a statute has the burden of clearly establishing its invalidity." *People v. Villareal*, 2023 IL 127318, ¶ 14. If reasonably possible, a reviewing court must "construe the statute in a way that preserves its constitutionality." *People v. Bochenek*, 2021 IL 125889, ¶ 10.

¶ 96        "A constitutional challenge to a statute may be either facial or as applied." *People v. Hilliard*, 2023 IL 128186, ¶ 21. "A facial challenge requires a showing that the statute is unconstitutional under any set of facts, whereas an as-applied challenge is dependent on the particular facts and circumstances of the challenging party." *Id.* The constitutionality of a statute presents a question of law and is subject to *de novo* review. *Villareal*, 2023 IL 127318, ¶ 14.

¶ 97        The second amendment to the United States Constitution states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. The United States Supreme Court has held that the second and fourteenth amendments (U.S. Const., amends. II, XIV) "protect the right of an

ordinary, law-abiding citizen to possess a handgun in the home for self-defense" and "an individual's right to carry a handgun for self-defense outside the home." *Bruen*, 597 U.S. at 8-10 (2022) (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010)).

¶ 98 "In *Bruen*, the Supreme Court announced a test for assessing the constitutional validity of laws seeking to regulate conduct protected by the second amendment." *People v. Burns*, 2024 IL App (4th) 230428, ¶ 15. It held that (1) "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct" and (2) to justify its regulation "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. "Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " *Id.* Under *Bruen*'s second step, the government must only "identify a well-established and representative historical *analogue*, not a historical *twin*." (Emphases in original.) *Id.* at 30.

¶ 99 As stated, defendant raises both a facial and as-applied constitutional challenge to the UPWF statute. Regarding his facial challenge, he argues that, under *Bruen*'s first step, his conduct in possessing a firearm is presumptively protected by the second amendment and, under *Bruen*'s second step, the State cannot show a relevantly similar historical tradition of regulations like the UPWF statute, "which permanently disarms individuals based solely on their felon status." With respect to his as-applied challenge, defendant, again, argues that under *Bruen*'s first step, his conduct in possessing a firearm is protected. Under *Bruen*'s second step, he argues that the predicate felony for his UPWF conviction was a drug-related offense and nonviolent in nature and "the State cannot prove that there is a historical tradition of prohibiting persons *** from

possessing firearms based on past non[ ]violent conduct."

¶ 100    We find defendant's constitutional challenges to the UPWF statute lack merit and note that Illinois appellate courts have repeatedly and consistently rejected challenges to Illinois statutes regulating firearm possession by felons. In *Burns*, 2024 IL App (4th) 230428, ¶ 21, we found the defendant's facial constitutional challenge to the UPWF statute lacked merit, holding *Bruen*'s "historical-tradition test" applied only to regulations affecting the possession of firearms by law abiding citizens. We stated as follows:

> "As a felon, [the] defendant, by definition, is not a law-abiding citizen. Thus, [the] defendant cannot show that his conduct was presumptively protected by the second amendment, and therefore, he does not fall within the scope of *Bruen*. As a result, [the] defendant cannot show that [the UPWF statute] violates the second amendment on its face under the *Bruen* framework." *Id.*

See *People v. Cadengo*, 2025 IL App (4th) 240568, ¶ 65 (declining to reconsider *Burns*); *People v. Huff*, 2025 IL App (4th) 240762, ¶ 16 (collecting cases reaffirming *Burns*); *People v. Gardner*, 2024 IL App (4th) 230443, ¶ 68 (citing *Burns* and rejecting a defendant's facial constitutional challenge to the UPWF statute).

¶ 101    Additionally, although some districts of our appellate court have rejected the argument that felons fall outside of *Bruen*'s scope, those courts have still concluded that constitutional challenges to felon-in-possession statutes nevertheless fail. Such cases have consistently rejected constitutional challenges under *Bruen*'s second step, finding that modern statutes regulating firearm possession by felons have relevant historical analogues. See *People v. Brooks*, 2023 IL App (1st) 200435, ¶ 100 (holding that "both the founding-era historical record and Supreme Court precedent support the ability of our legislature to prohibit firearm possession

by people who have demonstrated disrespect for legal norms of society" (internal quotation marks omitted)); *People v. Macias*, 2025 IL App (1st) 230678, ¶¶ 31-34 (rejecting a constitutional challenge to the armed habitual criminal statute under *Bruen*'s second step); *People v. Woodhouse*, 2026 IL App (1st) 240827, ¶ 47 ("[U]nder the second step of the *Bruen* analysis, the [UPWF] statute is consistent with the historical tradition of firearm regulation."); *People v. Travis*, 2024 IL App (3d) 230113, ¶ 33 (holding the UPWF statute is "consistent with this nation's history of preventing potentially dangerous individuals from exercising the right to bear arms"); *People v. Stephens*, 2024 IL App (5th) 220828, ¶ 39 (concluding the State "met its burden of showing that [the UPWF statute] is consistent with this nation's historical tradition of firearm regulation").

¶ 102        This court and others have also rejected similar as-applied constitutional challenges to the one defendant raises on appeal. In *Cadengo*, 2025 IL App (4th) 240568, ¶ 68, we "decline[d] to distinguish between violent and nonviolent felonies." We stated as follows: "[I]ndividuals fall outside the protections of the second amendment not only because of felonious violence, but also because of their refusal to behave lawfully. Even nonviolent felons are excluded from the second amendment's protections." *Id.*; see *Brooks*, 2023 IL App (1st) 200435, ¶¶ 100-05 (rejecting an as-applied challenge to the armed habitual criminal statute and stating "that both the founding-era historical record and Supreme Court precedent support the ability of our legislature to prohibit firearm possession by people who have demonstrated disrespect for legal norms of society" (internal quotation marks omitted)); *People v. Gray*, 2025 IL App (1st) 191086-B, ¶ 23 (rejecting an as-applied constitutional challenge to the armed habitual criminal statute, stating the *Bruen* test did not apply even when the defendant's prior felonies were nonviolent); *People v. Smith*, 2025 IL App (5th) 230656, ¶¶ 34-36 (finding the defendant's as-applied constitutional challenge to the armed violence statute based on his alleged nonviolent status failed under both the first and second

steps of *Bruen*).

¶ 103 Here, defendant raises similar arguments to those already rejected by this court and in other cases. We decline to reconsider those cases and adhere to our previous rulings.

¶ 104 III. CONCLUSION

¶ 105 For the reasons stated, we affirm the trial court's judgment.

¶ 106 Affirmed.

*People v. Wallace*, 2026 IL App (4th) 250795

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Tazewell County, No. 23-CF-357; the Hon. Christopher R. Doscotch, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Christopher McCoy, and Nicholas O'Connor, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Kevin E. Johnson, State's Attorney, of Pekin (Patrick Delfino, David J. Robinson, and Allison Paige Brooks, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |